LIQUID ENERGY
CORPORATION, Appellant,

v.

TRANS–PAN GATHERING, INC. and
Trans–Pan Pipeline Company,
Appellees.

No. 07–87–0188–CV.

Court of Appeals of Texas,
Amarillo.

Aug. 26, 1988.

Rehearing Denied Oct. 13, 1988.

Hinkle, Cox, Eaton, Coffield & Hensley, Amarillo, Richard R. Wilfong, Jerry F. Shackelford and David T. Markette, Eugene L. Smith, Houston, for appellant.

Gassaway, Gurley, Sheets & Mitchell, Jody G. Sheets and Timothy D. Zeiger, Borger, W. James Kronzer, Houston, Locke, Purnell, Rain, Harrell, Marshall M. Searcy, Jr. and Jody L. McPherson, Dallas, for appellees.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

BOYD, Justice.

In six points, appellant Liquid Energy Corporation (LEC) appeals from a judgment in favor of appellees Trans–Pan Gathering, Inc., Trans–Pan Pipeline Company, and the law firms of Gassaway, Gurley, Sheets & Mitchell and Rain, Harrell, Emery, Young & Doke.[1] In those six points, LEC says the trial court erred in (1) awarding Trans–Pan Gathering (TPG) damages for lost profits; (2) awarding Trans–Pan

---

1. LEC includes W.R. Edwards, Jr., individually, as one of the appellees. However, Mr. Edwards' individual claims were severed and docketed as Cause No. 68,716–C. Accordingly, Mr. Edwards is not a party to this appeal.

Pipeline (TPP) damages based on LEC's purported sale of its central compressor station; (3) awarding TPP damages for overcharges to the parties' joint operating account and damages for unaccounted-for liquid hydrocarbons; (4) rendering a declaratory judgment that certain properties were additions and modifications to the original gathering system; (5) awarding attorney's fees directly to the attorneys for TPG and TPP; and (6) awarding prejudgment "Cavnar" interest of ten percent (10%) per annum on contractual damages awarded to appellees. We affirm that judgment.

TPG and TPP first filed suit in March 1985 in the 84th Judicial District Court of Hutchinson County, Texas (Cause No. 14,-806 or "LEC I"), to recover damages from LEC based upon LEC's alleged breach of six contracts. Those contracts were: (1) a Contract for Sale, dated August 12, 1983, between TPG, TPP and Page Petroleum, Inc.[2] and LEC relating to the sale by Plaintiffs and Page of a gas gathering system and central compressor station located in Hutchinson County, Texas ("the Contract for Sale"); (2) a Gas Gathering and Compression Agreement, dated September 9, 1983, between TPP and LEC whereby LEC agreed to gather and compress TPP's Hutchinson County gas ("the Gathering and Compression Agreement"); (3) a Gas Processing Agreement between TPG and LEC, dated June 15, 1984, whereby LEC agreed to process 100% of TPG's deliverable gas from Moore and Hutchinson counties ("the Processing Agreement"); (4) a Gas Purchase Agreement, also dated June 15, 1984, between TPG and LEC whereby LEC agreed to purchase and pay for 100% of TPG's deliverable gas from Moore and Hutchinson counties ("the Purchase Agreement"); (5) a Gas Processing Agreement, dated June 15, 1984, between TPP and LEC for the processing of TPP's Hutchinson County gas; and (6) a Gas Purchase Agreement, dated June 15, 1984, between TPP and LEC for the purchase of TPP's Hutchinson County gas. Plaintiffs also sought

injunctive relief to specifically enforce the Gas Processing and Purchase agreements.

Before the trial of LEC I, the district court severed certain of Plaintiffs' claims, including all claims under the Contract for Sale and the Gathering and Compression Agreement, and transferred those claims on an agreed change of venue to the 251st Judicial District Court in Potter County, Texas, where they were docketed as Cause No. 67,403–C (this case).

LEC I was tried to the court, which rendered judgment on May 1, 1986 for TPG and TPP in the amount of $1,432,278.10 and prejudgment interest of $111,792.15, and awarded $47,385.85 as attorney's fees to Gassaway, Gurley, Sheets & Mitchell and $47,385.86 as attorney's fees to Rain, Harrell, Emery, Young & Doke. That judgment was appealed by LEC to this Court and was this day decided. *Liquid Energy Corp. v. Trans-Pan Gathering*, 758 S.W.2d 627 (Tex.App.—Amarillo 1988, writ pending).

This case was tried to a jury on March 9–19, 1987. The issues tried included Plaintiffs' claims for breach of the Contract for Sale and the Gathering and Compression Agreement, as well as TPG's claims for LEC's failure and refusal to accept, process, purchase and pay for 100% of TPG's deliverable gas from December 15, 1985, through June 30, 1986, in violation of the Processing and Purchase agreements and an injunction entered in LEC I.

On April 21, 1987, the trial court, after considering and overruling LEC's alternative post-trial motions for judgment on the verdict or judgment n.o.v., entered judgment for Plaintiffs. The judgment awarded damages as follows: (1) $1,200,000.00, plus prejudgment interest of $129,824.81, to TPP for breach of the Contract for Sale; (2) $413,063.00, plus prejudgment interest of $81,722.01, to TPP for LEC's failure to account for liquids under the Gathering and Compression Agreement; (3) $119,-399.08, plus prejudgment interest of $10,-013.86, to TPP for overcharges by LEC

---

**2.** TPP is a Texas general partnership. Its sole partners are TPG and Page. At the time this action was tried, the managing partner of TPP was Page, which authorized TPG to represent its interest, as a partner of TPP, in this action. Page was not a party in the case below and is not a party to this appeal.

under the Gathering and Compression Agreement; (4) $17,128,329.00 plus prejudgment interest of $1,436,533.34, to TPG for its lost profits caused by LEC's breach; (5) $32,012.54, plus prejudgment interest of $4,448.59, to TPG for lost interest caused by LEC's improper suspension of payments; (6) $2,361,600.44 to the law firm of Gassaway, Gurley, Sheets & Mitchell for attorney's fees rendered in this case; (7) $2,361,600.45 to the law firm of Rain, Harrell, Emery, Young & Doke for attorney's fees rendered in this case; and (8) postjudgment interest at the rate of ten percent (10%) per annum from the date of judgment. Each attorney's fee award was made a "part of the Judgment hereby rendered." [3]

The judgment also granted the following declaratory relief based upon the jury's findings: (a) that LEC has not discontinued operations of the Plant and related Gathering facilities as defined in the Processing Agreement; (b) that certain enumerated items are additions and modifications to the gas gathering system in place under the Gathering and Compression Agreement; and (c) that the Gathering and Compression Agreement has not terminated. LEC filed timely motions to modify the judgment and for new trial, which were overruled by operation of law. Thereafter, LEC perfected this appeal.

■ In its first point, LEC contends that the trial court erred in awarding TPG damages for lost profits caused by LEC's refusal to process and purchase non-conforming gas from TPG after December 15, 1985. Initially, LEC argues that, as a matter of law, the jury finding that TPG was unable to tender gas conforming to the gas purchase agreement's specifications precluded recovery by TPG. The damage award is based on the jury's answers to Special Issues 4, 5 and 6, as follows:

### Special Issue No. 4

Do you find from a preponderance of the evidence that, between the dates of December 15, 1985, and June 30, 1986, LEC failed to accept, process and pay for one hundred percent (100%) of the casinghead gas that Plaintiffs had available for delivery from within the area of interest (defined in the "Gas Processing Agreement(s)["] dated June 15, 1984, Plaintiffs' Exhibits 5a, 6a)?

Answer: Yes.

### Special Issue No. 5

Do you find from a preponderance of the evidence that Plaintiffs, during the period of December 15, 1985, through June 30, 1986, would have made profits if LEC had accepted, processed and paid for one hundred percent (100%) of the casinghead gas which Plaintiffs had available for delivery from within the area of interest?

Answer: Yes.

### Special Issue No. 6

What amount of money, if any, do you find from a preponderance of the evidence would reasonably compensate Trans–Pan Gathering, Inc. for the lost profits, if any, found in answer to Special Issue No. 5?

Answer: $17,128,329.00

Special Issue 12 inquired:

Do you find, from a preponderance of the evidence that, during the period from December 15, 1985, to June 30, 1986, Trans–Pan Gathering, Inc. was capable of delivering gas which met the quality specifications required by the Gas Purchase Agreement, dated June 15, 1984?

Answer: No.

Parenthetically, we note that appellees objected to the submission of Special Issue 12 for the reason that it improperly placed the burden of proof on them on a defensive issue and that it was immaterial. While LEC objected to this issue, it gave no specific grounds as a basis for its objection.

LEC argues that the jury's "no" answer to Special Issue 12 establishes that the required tender would not have occurred. However, such negative answer indicates

---

3. The jury verdict totaled $6,612,481.25 for trial and appellate services, but the trial court reduced the award to the figure found by the jury for preparation and trial of the action.

only that the fact finder was not persuaded that TPG was capable of delivering gas, or that the party with the burden of proof in the matter had failed to persuade it as to TPG's capability to deliver gas. It is not an affirmative finding that TPG was incapable of performance. *Grenwelge v. Shamrock Reconstructors, Inc.*, 705 S.W.2d 693, 694 (Tex.1986).

The reasoning of this Court in *Amarillo Oil Co. v. Ranch Creek Oil & Gas Co.*, 271 S.W. 145 (Tex.Civ.App.—Amarillo 1925), *writ dism'd*, 288 S.W. 1114 (Tex.Comm'n App.1926), is instructive and analogous to the question presented here. In that case, Ranch Creek Oil, a seller of natural gas, sought damages for Amarillo Oil's failure to take and pay for Ranch Creek's gas. As relevant here, the jury answered special issues as follows:

No. 3 ... Has the Ranch Creek Oil & Gas Company at all times been ready, able, and willing to perform the contract of date August 28, 1919, above referred to?

Answer: No.

No. 4. Did the Amarillo Oil Company prevent the Panhandle Pipe Line Company from permitting the Ranch Creek Oil & Gas Company to turn its gas into the pipe line of said Panhandle Pipe Line Company.

Answer: Yes.

Upon its appeal, Amarillo Oil pointed out that Ranch Creek alleged performance of the contract upon its part, and that it had at all times been willing, ready, and able to perform, and to make the requisite connection to the pipeline, and even tendered the issue to that effect. Therefore, Amarillo Oil reasoned, the jury's failure to find that fact prevented any recovery by Ranch Creek. In response to that argument, this Court found that the failure to be ready was excused by Amarillo Oil's refusal to permit Ranch Creek to turn in any gas. That refusal, we said, entitled Ranch Oil to maintain an action for breach of contract and proof of Ranch Creek's willingness and ability to perform was relevant only as it bore upon the amount of damages suffered by Ranch Creek. *Id.* at 150.

This record shows, through the testimony of Homer Wynn Brooks, that LEC severed the connection between the point of delivery of gas by TPG and the point where LEC had the obligation to take custody of the gas delivered to it for processing on December 15, 1985. Roland Edwards, TPG's corporate representative, testified without objection that it was quite clear that LEC was not going to take TPG's gas "if they [LEC] could avoid it." Edwards also testified that LEC's corporate representative, Allen Tarbutton, refused to agree that LEC would take the gas, even if TPG, at its own expense, purchased the equipment necessary to make the gas meet all of the quality specifications in the Purchase Agreement.

Therefore, even though TPG may have alleged its ability to deliver gas, the jury's finding that it was prevented from delivery by the actions of LEC excused any requirement that TPG prove such ability since that ability was relevant only as it bore upon the amount of damages suffered by it. *Amarillo Oil Co. v. Ranch Creek Oil & Gas Co.*, 271 S.W. at 150. *See also Laredo Hides Co., Inc. v. H & H Meat Products Co., Inc.*, 513 S.W.2d 210, 221 (Tex.Civ.App. —Corpus Christi 1974, writ ref'd n.r.e.).

■ Secondly, LEC argues that it had no obligation under the Gas Processing Agreement to process TPG's gas after December 15, 1985. LEC contends there was no evidence or, alternatively, factually insufficient evidence to support the jury's finding that LEC did not discontinue operation of its plant on December 15, 1985, pursuant to the Gas Processing Agreement. This, of course, requires us to review the pertinent evidence. Additionally, LEC argues that, as a matter of law, res judicata precludes TPG's claim for lost profits under the contracts of June 15, 1984.

Under Article I.J of LEC's and TPG's Gas Processing Agreement, LEC took possession of TPG's Moore County casinghead gas at the "Point of delivery," defined as the point of measurement at the REO– Barnhill Compressor Station. LEC then transported the gas down the REO–Barnhill line to LEC's Canadian River Gas Pro-

cessing Plant for processing. After processing, the residue (processed) gas was redelivered for the account of TPG at the "Point of redelivery," defined in Article I.K as the Plant's tailgate, a point of measurement located immediately downstream of the Plant.

The "Plant" was defined in Article II as "a cryogenic plant for the recovery of liquefiable hydrocarbons from the gas gathered from Gatherer [TPG] at the Point of Delivery." "Gathering facilities" were defined in Article I.O as "facilities installed in the field by Plant Owner or its agent in order to collect the gas and liquid hydrocarbons covered hereunder from the Point of Delivery and deliver it for processing at the Plant. Gathering facilities shall include field compression facilities but not plant recompression facilities."

Article XII of the Gas Processing Agreement allowed LEC to discontinue the operation of the Plant and Gathering facilities "if, in its sole discretion, such operations shall be deemed unprofitable." To exercise this right LEC was required to give TPG written notice of the date on which the operations would be discontinued, such date to "not be earlier than three (3) months after the date of such notice." At any time after two years from the effective date of the Gas Processing Agreement, either party was allowed, upon showing that continued operation under the terms of the Gas Processing Agreement would be unprofitable to such party, and upon giving three months written notice, to terminate the Agreement, irrespective of continued Plant operation.

The jury in answer to Special Issues 1 and 1a found that LEC did not discontinue operation of the Plant and Gathering facilities on December 15, 1985. The lost profits of $17,128,329 awarded TPG are predicated on the finding that LEC did not discontinue operation of its Canadian River Plant and related Gathering facilities on December 15, 1985, and, therefore, the Gas Processing Agreement did not terminate and LEC's obligation to transport, process and purchase TPG's gas continued. Special Issue 3 inquired as to whether LEC, at least

ninety days prior to December 15, 1985, gave written notice to Plaintiffs that LEC would discontinue operations of the Plant and Gathering facilities. The jury answered "no."

In deciding a "no evidence" point of error, this Court must consider only the evidence and the inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). When considering a factual insufficiency point of error, this Court must examine the entire record to determine if the evidence supporting the finding is so weak, and the evidence to the contrary so overwhelming, that the finding is manifestly unjust. *Garza v. Alviar*, 395 S.W.2d at 823; *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Both parties acknowledge that the final judgment in LEC I granted LEC the right to discontinue operations of the Canadian River Processing Plant and related Gathering facilities on November 1, 1985. LEC contends that the Plant was shut down at 7:00 a.m. on December 15, 1985, that no gas was processed afterward, and that the "Gathering facilities" defined in the Gas Processing Agreement were not used after December 15, 1985.

LEC argues that it operated three gathering systems in Hutchinson County—the TP gathering system purchased from TPP; the JS (Jaten/American Star) gathering system constructed by LEC to transport Jaten/American Star gas under contracts with those entities; and the defined "Gathering facilities" of the Canadian River plant.

After December 15, 1985, LEC admits that it continued to operate the TP system to meet its obligations under the Gas Gathering and Compression Agreement with TPP. However, it argues that the TP and JS gathering systems were separate from the systems used to transport TPG gas from the REO–Barnhill station to the Canadian River Plant under the June 15, 1984 agreements. Therefore, LEC says, its operation of its other gathering systems, pursuant to contracts with parties other than

TPG, including TPP, was not a continuation of Canadian River plant operations.

In this connection, Mr. Edwards testified that upon review of the flow logs, he was able to determine that LEC utilized parts of the gathering system of the Plant and had circulated gas through the fuel gas system within the Plant and out fuel gas lines up until January 27, 1986. He stated that the fuel gas system was a part of the defined gathering system. He also testified "I know that—I have reason to be fairly certain" that LEC was in fact operating the system.

Pointing to Edwards' testimony on cross-examination that all "processing" after December 15, 1985, was done at what he called the "little p" plant at the TP–2 location on the JS System instead of what he called the "big p" Plant, the cryogenic unit at the Canadian River Plant that was shut down, LEC argues that these operations on the JS system have nothing to do with the defined "Plant" and "Gathering facilities" that were required to be closed.

Homer Brooks, LEC's plant superintendent, admitted that some gas had come into the plant inlet and was treated and processed at the plant after December 15, 1985, and until December 31, 1985. This, he said, was because "I just can't reach over and shut the sulphur plant down, which is behind us, and we had to have a slowdown on it so that took a couple of weeks to let that come down."

Upon cross-examination, Allen Tarbutton testified to an agreement between LEC and two of its other suppliers of natural gas, Jaten and American Star. Under this agreement, Tarbutton said, if LEC closed its Canadian River Plant, LEC agreed to offer for sale to Jaten and American Star, at salvage value, the gathering system LEC was using to gather Jaten's and American Star's gas. In order to make the offer, LEC had to furnish to Jaten and American Star an estimated salvage value and accounting documents supporting its claim. Had LEC actually discontinued operations of the Plant and Gathering facilities, the salvage value provisions of LEC's agreement with Jaten and American Star would have come into play. Yet, Tarbutton stated that LEC had not made any type of engineering or salvage study as required by that agreement.

Additionally, the record shows a lease between Jaten and LEC for the surface where the main "Plant" is located. The lease provided for a three-year term beginning April 1, 1986, a time, of course, subsequent to the date LEC says the plant operations were terminated, and ending March 31, 1989. The lease also provided that LEC had the right to terminate the lease if it gave thirty days written notice that the operations of the Canadian River Plant were to cease. Tarbutton testified that LEC gave this notice to Jaten and American Star at the same time, November 1, 1985, that they gave notice to TPG and TPP. This, of course, would have been several months before the lease was in fact signed.

LEC admits that it continued to process and treat gas, other than Plaintiffs' gas, until the time of the trial. LEC had contractual obligations to process gas delivered by Jaten and American Star. Under LEC's Processing Agreement with TPG, LEC had the right to install additional plants or capacity it decided were appropriate. Appellees argue that this additional capacity or plants were part of the Plant, regardless of whether they were physically located within the fence at the Canadian River Plant.

In order to meet its contractual obligations with Jaten and American Star, LEC began processing Jaten's and American Star's gas at locations physically a few hundred yards removed from the fence surrounding the location identified by LEC as the "Canadian River Plant." These locations were TP–1 (treating) and TP–2 (removing liquids). Homer Brooks, LEC's Area Superintendent, testified that after December 15, 1985, the treating and processing at TP–1 and TP–2 were substantially the same as what had previously been done at the main "Canadian River Plant"— removing water, debris, carbon dioxide, hydrogen sulfide and liquids for sale.

LEC argues that some of the processing done by the Canadian River Plant after January 1, 1986, did not involve a cryogenic unit and, therefore, it was not actually "processing." However, Allen Tarbutton, as employee of LEC, admitted the satellite plants were doing the same thing as the main Plant—that it was "business as usual"—except LEC was no longer processing TPG's gas.

In fact, LEC was contractually obligated to deliver fuel gas to TPP from the "Canadian River Plant." After December 15, 1985, LEC began delivery of fuel gas from the satellite plants. Under this record, the jury could reasonably have inferred that LEC's decision to deliver fuel gas from the satellite plants was evidence that the satellite plants were part of the main Canadian River Plant.

There was also evidence that LEC did not discontinue operations of the "related Gathering facilities". The Processing Agreement defines "Gathering facilities" as:

> ... those facilities installed in the field by Plant Owner [LEC] or its agent in order to collect the gas and liquid hydrocarbons covered hereunder from the Point of delivery and deliver it for processing at the Plant. Gathering facilities shall include field compression facilities but not plant recompression facilities.

Tarbutton testified that compression is required to move gas through any system, and fuel gas is required to operate compressors. Without fuel gas, the engines will not run and without engines, the compressors will not run. In answer to Special Issue 2(e), the jury found that the Gathering System included the fuel lines and compressors.

Mr. Brooks, LEC's area supervisor, testified that the fuel gas line went from the Canadian River Plant to every booster and every engine and compressor LEC had and admitted that the fuel gas line was still in use after December 15, 1985. LEC modified the fuel gas system after December 15, 1985, to permit the satellite plants at TP–1 and TP–2 to prepare the fuel gas originally prepared at the Canadian River Plant. LEC then moved the fuel gas through the same pipeline it had used before December 15.

Operations of the related gathering lines were also not discontinued. LEC argues that it operated three distinct gathering systems called the "TP Gathering System," the "JS Gathering System," and the "Canadian River Plant Gathering Facility." It is undisputed that the "TP" and "JS" Systems (as identified by LEC) were continually used. The issue is whether the so-called "TP" and "JS" Systems were, in fact, gathering systems distinct from the Gathering facilities defined in the Processing Agreement. Fred Crum, a witness designated by LEC to discuss modifications, extensions and changes in the gathering system, identified Plaintiffs' Exhibit 41 as a map showing the Canadian River Gathering System. The map shows the interconnections of one big gathering system.

Tarbutton admitted that the "TP" System and the "JS" System are not in fact separate and distinct. Isolation of the "JS" system from the "TP" system would require extensive modifications, including moving lines and disconnecting wells. Tarbutton admitted that the practice in the field of running the entire gathering system as a single entity was designed to save LEC money. Edwards agreed that it was simply one large gathering system because of the way LEC constructed and utilized it.

The jury was entitled to consider all of this evidence, together with all reasonable inferences from it, and believe all, part, or none of each witness's testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986), *aff'd after remand*, 735 S.W.2d 262 (Tex.1986). It is not the function of this Court to pass upon the credibility of witnesses or substitute its findings for those of the jury even though, after reviewing the evidence, it may have reached a different conclusion. *PGP Gas Products, Inc. v. Reserve Equipment*, 667 S.W.2d 604, 608 (Tex.App.—Austin 1984, writ ref'd n.r.e.). In summary, we find that the jury had sufficient evidence from which to determine that LEC did not discontinue the Plant and Gathering facilities.

LEC next contends that, as a matter of law, res judicata precludes TPG's claim for lost profits under the contracts of June 15, 1984. In a judgment signed on May 1, 1986, the trial court in LEC I granted the following declaratory relief:

1. The Court declares that, under the parties' contracts, LIQUID ENERGY CORPORATION is entitled to discontinue operation of its Canadian River Gas Processing Plant and related gathering facilities on November 1, 1985.

2. The Court declares that upon the discontinuance of operation of the Canadian River Gas Processing Plant and related gathering facilities by LIQUID ENERGY CORPORATION, under the terms of the parties' contracts and this order, the Gas Processing Agreements between LIQUID ENERGY CORPORATION and TRANS–PAN GATHERING, INC. and TRANS–PAN PIPELINE COMPANY dated June 15, 1984, shall terminate and LIQUID ENERGY CORPORATION shall be relieved of its obligation to process Plaintiffs TRANS–PAN GATHERING, INC. and TRANS–PAN PIPELINE COMPANY's gas.

Res judicata is an affirmative defense which requires proof of the elements, including proof of the issues actually adjudicated in the former proceeding. *Ogden v. Coleman,* 660 S.W.2d 578, 583 (Tex.App.—Corpus Christi 1983, no writ); *Twin City Fire Ins. Co. v. Foster,* 537 S.W.2d 760, 763 (Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.); Tex.R.Civ.P. 94. Thus, LEC had the burden to prove that the trial ending October 10, 1985, actually adjudicated the issue of whether LEC continued to operate the Plant and related Gathering facilities through March 19, 1987. Without establishing that this issue was foreclosed by the prior proceeding and not left open for future adjudication, LEC cannot rely upon this affirmative defense. *See Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 384 (Tex.1985).

LEC argues that since the pleadings in LEC I sought future damages, the judgment necessarily determined the issues in the present case. However, the judgment in the first case ordered specific performance of the contracts and the case at bar concerns LEC's alleged failure to comply with the specific performance ordered by the trial court. These are two different causes of action.

LEC also argues that the issue of discontinuance of operations was the subject of post-trial hearings in LEC I. However, an earlier trial cannot dispose of issues that arose after the date of the hearing. *Hudspeth v. Hudspeth,* 673 S.W.2d 248, 252 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.). The pleadings in this case indicate that LEC believed "[t]hese findings [in LEC I relating to LEC's ability to accept gas] relate to alleged facts prior to October, 1985, and cannot be used to establish facts as to the conditions existing from December 15, 1985, forward" and in an objection to the admission of deposition testimony from LEC I's post-trial hearing, LEC argued that "a hearing [on January 22, 1985] on some motions of post trial in the first case that the court heard, and our position on that is ... it's improper for ... hearing testimony relating to an entirely different lawsuit and entirely different issues to become part of the record in this case." TPG's damages in the instant case, based upon LEC's alleged breach of the contract and injunction occurring between December 15, 1985, and June 30, 1986, are not barred by a trial that occurred prior to the wrongful act. *Powell v. Powell,* 703 S.W.2d 434, 436 (Tex.App.—Waco 1985, writ ref'd n.r.e.), *appeal dism'd,* 476 U.S. 1180, 106 S.Ct. 2911, 91 L.Ed.2d 541 (1986); *Norton v. Humble Oil & Refining Co.,* 227 S.W.2d 860, 862 (Tex.Civ.App.—Dallas 1950, no writ).

LEC next argues that there was no evidence or, alternatively, factually insufficient evidence to support the amount of damages found by the jury. We must again examine the record under the *Garza v. Alviar,* 395 S.W.2d at 823, standard to determine the "no evidence" and insufficiency questions.

LEC argues, and appellees agree, that the admission of Findings of Fact 43 and 44 from LEC I are inadequate to support the

jury's findings on damages or to the deliverability capacity from December 15, 1985 to June 30, 1986. Both parties agree that the time covered by the findings of fact was limited to the events surrounding LEC I.

A fundamental principle which this Court must apply when reviewing the jury's verdict based upon conflicting evidence is that the trier of fact is the sole judge of the weight and credibility of the evidence. Where the evidence is conflicting, it is the function of the fact finder to weigh that evidence and determine the truth. *Carroll Instrument Co. v. B.W.B. Controls*, 677 S.W.2d 654, 657 (Tex.App.—Houston [1st Dist.] 1984, no writ). The reviewing court is bound by those findings. *Id.*

Plaintiffs presented testimony from Mr. Edwards showing that the actual deliverability of gas in the Moore County system exceeded 40,000,000 cubic feet per day at all times relevant to the case at bar. Edwards testified that the wells in issue were atypical, with high deliverabilities. He further stated that nothing had occurred to reduce the deliverability. He concluded that the wells behind the Moore County System had a deliverability of 40,000,000 cubic feet or more a day.

LEC claims that the testimony of its in-house employee, Dan Jones, and a "Jackson Study" were "overwhelming" evidence that TPG's deliverable gas was only 12.5 MMcf per day. After LEC introduced into evidence the "Jackson Study," TPG called its author, Bill Jackson, as a witness. Jackson testified that his report did not show the deliverability of any well on the system but, instead, is basically a volume through-put. He explained that the initial rate used to project reserves, roughly 12.5 million, was the volume of gas the pipeline had sold, not a well deliverability. He refused to agree that the deliverability of the wells was less than 40,000,000 cubic feet per day. There was no cross-examination of Jackson.

TPG also called Ron Briggs, an independent Petroleum Consultant and Petroleum Engineer. Briggs testified that Edwards' methodology was reasonably accurate. Briggs explained the distinction between delivered quantities of gas as opposed to deliverability. He explained that deliverability could vary widely from the amount actually delivered and that past deliveries are not a direct indication of deliverability.

Dan Jones, an engineer specializing in deliverability calculations, testified that TPG's deliverability was only in the range of 12.5 MMcf per day. Jones' study consisted of looking at Dwight's Oil and Gas Reports showing how much gas was actually accepted from wells over a period of time. According to Jones, the definition of deliverability is what is actually delivered— there is no difference between deliveries and capacity to deliver. The jury, as was their right, apparently chose to follow Edwards' theory of deliverability capacity.

LEC argues that the second defect in the damage award is that the price paid by TPG for producers' gas would have remained $2.40 per MMBtu and had never changed. Edwards testified that the price had in fact been changed in the past and that renegotiation had occurred between TPG and its producers. Edwards further testified, without objection, that under the contracts with his producers he had the ability to vary the price. On cross-examination, Edwards explained that not all contracts with TPG's producers were the same. He testified that economic conditions indicated the value of the gas, particularly market value of the gas, was heading down.

As TPG's president, Edwards specifically stated that spot market pricing would have occurred had LEC complied with the agreement. When asked to refigure damages at a $2.40 price, Edwards reiterated that maintaining the price at $2.40 was not a possibility. Instead, the price would be automatically reduced because of the way the contracts were written. LEC offered Don McGee's testimony refuting Edwards' damage calculations. McGee calculated TPG's net profits for the relevant damage period to be only $1,238,415, even if LEC had been obligated to process and purchase TPG's gas.

█ LEC next argues that there was no evidence the producers would go along with the price reduction. Edwards testified that, in reasonable probability, TPG's producers would have agreed. He testified that falling prices resulted in spot market pricing throughout the Panhandle and that contracts were being renegotiated in the industry in this manner. Ron Briggs, an independent expert, confirmed that this pricing method was reasonable and common in the industry. In his judgment, the assumption that TPG would have paid its producers 80% of spot market prices was reasonable. Again, it was within the province of the jury to resolve any dispute in the evidence. *Carroll Instrument Co. v. B.W.B. Controls,* 677 S.W.2d at 657.

LEC's complaint that the lost profit calculations are speculative is based upon its conclusion that there was no evidence of deliverability and no evidence that the gas purchased by TPG would cost less than $2.40 MMBtu. However, both Edwards and Briggs testified that under the existing LEC contracts, occurrences in the market and the industry, and past experience in this established business, damages of between $22,155,439.97 and $18,150,900.00 were reasonable, probable and amply supported by good engineering practices and analysis. The jury found damages of $17,128,329.

Unlike the particular facts of *Automark of Texas v. Discount Trophies,* 681 S.W.2d 828 (Tex.App.—Dallas 1984, no writ), cited by LEC, this record has objective documentation of past profitability and net profit. Testimony by LEC's own employees established that under a worst-case analysis, TPG would have recovered profits of $371,401. Utilizing a rate of 40 million mcf per day, LEC's McGee testified that lost profits would be between $6,578,000 and $2,500,000. Further, LEC tendered Jackson's report into evidence as Defendant's Exhibit 35 and is bound by it. *See Southwestern Chem. & G. Corp. v. Southeastern P.L. Co.,* 369 S.W.2d 489, 493 (Tex.Civ.App.—Houston 1963, no writ). Jackson's report, which appears to consider only processing, concludes TPG would make a net profit of $.65 per Mcf. This equates to $5,148,000

from December 15, 1985 to June 30, 1986. Jackson's report also deducts from the net profit $25,000 a month operating expenses which TPG alleges it had already paid. The Gas Processing and Gas Purchasing agreements themselves were in existence and formed a reasonable basis to calculate the lost profits. *See Harper Building Systems, Inc. v. Upjohn Co.,* 564 S.W.2d 123, 126 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.). There was sufficient evidence in the record to justify the jury's resolution of the evidentiary conflicts about the damages and the method of assessment of those damages.

█ LEC's final argument is that the proper measure of damages is not lost profits, but, rather, the difference between the market price and the contract price, together with any incidental damages, less expenses saved. Tex.Bus. & Comm.Code § 2.708(a) (Tex.UCC) (Vernon Supp.1988).

Lost profits is the proper measure of damages. Texas Business and Commerce Code section 2.708 (Tex.UCC) (Vernon Supp.1988) establishes the measure of damages a seller may recover for its buyer's nonacceptance or repudiation. It provides:

(a) Subject to Subsection (b) and to the provisions of this chapter with respect to proof of market price (Section 2.723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this chapter (Section 2.710), but less expenses saved in consequence of the buyer's breach.

(b) If the measure of damages provided in Subsection (a) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this chapter (Section 2.710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

By physically capping and welding the only pipeline available to TPG to get its gas to market, LEC deprived TPG of any market for its gas without additional expenditures. LEC's actions, which effectively destroyed TPG's ability to get its gas to a market, made lost profits an appropriate measure of recovery to place TPG in as good a position as LEC's performance would have done. *See Donnelley Marketing v. Lionel Sosa, Inc.,* 716 S.W.2d 598, 603 (Tex.App.—Corpus Christi 1986, no writ); *Chrysler Corp. v. Schuenemann,* 618 S.W.2d 799, 805 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). Finding sufficient probative evidence to support the jury's findings as to damages for lost profits, appellant's first point is overruled.

In its second point, LEC alleges the trial court erred in awarding TPP damages based on LEC's purported sale of its central compressor station under the Contract for Sale of August 12, 1983. The Contract for Sale requires LEC to pay sellers (TPP, TPG and Page) $1,200,000 in the event of a subsequent resale of the central compressor to an unrelated third party within three years from the date of closing. The trial court awarded TPP $1,200,000 based on the jury's findings in Special Issues 16 and 16a that LEC had sold the TP–1 compressor station before the contract's third anniversary. Again, we have conflicting testimony, which the jury was entitled to consider, together with all reasonable inferences therefrom, and believe all, part, or none of each witness's testimony. *McGalliard v. Kuhlman,* 722 S.W.2d at 697.

Edwards testified, without objection, that Allen Tarbutton, senior vice-president of LEC, admitted to him that the central compressor was involved in a sale-leaseback arrangement with an unrelated third party for certain equipment including TP–1 in Hutchinson County. Tarbutton testified that LEC had not sold the TP–1 central compressor station and that his discussion with Edwards about the company's sale-leaseback financing arrangement only related to the REO–Barnhill Compressors.

After the sale-leaseback arrangement, LEC was required by the purchaser to place plaques on each piece of equipment involved in the sale. No plaques were placed on the compressors at the central compressor station. However, Homer Brooks, former manager of LEC's Canadian River Plant, identified a log for March 12, 1986, on which he had written that he installed thirteen plaques "on all equipment at Canadian River Plant, TP–1, and Barnhill Station." Brook Hamilton, LEC's treasurer and Vice President of Finance, testified that the TP–1 central compressor station and its equipment were excluded from the sale-leaseback arrangement.

It is not the function of this Court to pass upon the credibility of witnesses or substitute its findings for those of the jury even though, after reviewing the evidence, it may have reached a different conclusion. *PGP Gas Products, Inc. v. Reserve Equipment,* 667 S.W.2d at 608. The jury had sufficient evidence, although conflicting, from which to determine that LEC sold its central compressor station within three years of the date of the Contract for Sale and that appellees were entitled to damages under the Contract for Sale. Appellant's second point is overruled.

In its third point, appellant argues that the trial court erred in awarding TPP damages for overcharges to the parties' joint operating account. It additionally argues that error was committed in awarding damages for unaccounted-for liquid hydrocarbons under the Gas Gathering and Compression Agreement of September 9, 1983.

TPP alleged in its Second Claim that improper charges for compressor rental charges and ad valorem taxes were made to the joint operating account maintained on the TP gathering system under the Gas Gathering and Compression Agreement. Article VII of the Agreement sets out the method of handling and prorating operating costs among the shippers. The jury found in Special Issues 14 and 14a that LEC charged TPP with more than its pro rata share of operating costs under the Agreement. Based upon the jury's answers, the court awarded $119,399.08 plus interest as "overcharges for TPP Company's pro rata share of the operating cost

under the terms of the Gas Gathering and Compression Agreement, dated September 9, 1983."

TPP alleged in its First Claim that LEC failed to account to TPP for liquids which LEC permitted third parties to remove from the TP gathering system. Article VII.C of the Gas Gathering and Compression Agreement provided that LEC was to account to TPP for its pro rata share of liquids collected between the points of delivery (the well field meters) and redelivery (the TP–1 Compressor Station discharge). The jury found, in Special Issues 13 and 13a, that LEC failed to account for TPP's pro rata share of liquids and the amount of damages TPP sustained.

Based upon the jury's answers the court awarded $413,063 plus interest "for the value of liquids for which LIQUID ENERGY CORPORATION failed to account to TRANS–PAN PIPELINE COMPANY under the terms of the Gas Gathering and Compression Agreement, dated September 9, 1983." LEC argues that there was "no evidence" or, alternatively, factually insufficient evidence, to support the jury's findings in Special Issues 13, 13a, 14 and 14a.

Under the Gathering and Compression Agreement, TPP was required to pay its pro rata share of the operating costs for the gathering system. That pro rata share was equivalent to a pro rata share of Mcf received from all sources for gathering through the gathering system. The costs of fuel gas and field booster compressors were not included within the purview of the operating costs which the Agreement permitted LEC to charge against TPP's account. TPP argues that it was the intention of the parties that these operating costs be limited to a reasonable cost. Article XII(A) states: "Operating costs shall include, but not be limited to, the costs of supplies, materials and labor reasonably necessary for the efficient operation and maintenance of the gathering system, but shall not include the cost of fuel gas."

It is undisputed that LEC's billings to TPP's account included charges for rental of compressors and ad valorem taxes. Further, LEC admitted making errors and

overcharges during the course of the business relationship. From this evidence of admitted errors and admitted charges for expenses not permitted under the contract, the jury could have reasonably believed that LEC charged in excess of a reasonable amount for the permitted operating costs.

■ In addition, Edwards testified that he had reviewed the underlying documentation, to the extent it was provided by LEC, and calculated a reasonable operating cost for those expenses that LEC could charge TPP. His calculations were marked as Defendant's Exhibit 13 and introduced into evidence by LEC. Edwards' calculations also applied to the entire Gathering System, not just the "TP" system.

LEC contends that TPP never paid LEC's statements of charges for operating costs and, therefore, there could be no money award to TPP for overcharges. The record shows that LEC applied $672,048.21 of the condensate revenue due TPP under Article VII(C) of the Gathering and Compression Agreement against LEC's statements of charges for operating costs. Thus, it was proper for the district court to enter a damage award in favor of TPP for the amount of overcharges found by the jury.

■ Secondly, under this point, LEC argues that there was no evidence or, alternatively, factually insufficient evidence to support the jury's finding that LEC did not properly account to TPP for liquid hydrocarbons which it permitted third parties to remove from the gathering system.

The jury found in answer to Special Issues 13 and 13a that LEC failed to account for all liquids dropped or taken out of the gas stream, and that the fair market value of the liquids for which LEC failed to account was $413,063, the amount of the district court's judgment. TPP's claim for unaccounted-for liquid hydrocarbons was based on Article VII of the Gas Gathering and Compression Agreement which provided that LEC was to account to TPP for its pro rata share of liquid hydrocarbons collected between the points of delivery and re-delivery.

LEC was the custodian of the records of the gathering system and had the responsibility to account for condensate recovered from the system. When gas was produced from the wellhead and transported through various compressor stations, liquids in the form of water and hydrocarbons would occasionally drop out of the gas stream and collect at various points in the pipeline. Edwards testified that after extensive study of the records kept by LEC, he determined that there was no accurate accounting by LEC for condensate (that is, hydrocarbon liquids which are beneficial as opposed to water and debris which are not valuable). He testified that Homer Brooks kept a weekly activity report showing how much condensate was shipped out, both in the form of trucks and through pipelines, to purchasers. LEC also received load tickets from individuals who would remove condensate through trucks. Edwards reviewed information from some of the individuals who removed liquids, particularly American Star, and their reports of how much condensate had been removed.

Edwards compared the amount of gas produced at the wellhead with the amount of gas delivered at the re-delivery point. He stated that the difference constituted liquid hydrocarbons that had dropped out of the gas stream. He testified that this method was proper, based upon reasonable engineering principles, because the gas pipeline system is a closed system; when gas produced at the wellhead is not delivered to the re-delivery point, the gas has escaped the system, either because of a leak or because it has been turned into a liquid and removed as condensate. He also testified that the actual percentage of condensate which was accounted for went as high as thirty per cent (30%) in some instances and involved hundreds of thousands of gallons.

LEC did not dispute that liquids fell out of the system as condensate and were removed from the system. LEC argues that the meters at the wellhead were inaccurate, and, therefore, when the gas measured downstream from the discharge of the TP–1 compressor is added with the condensate for which LEC did account to TPP, the sum equals the volume of gas, together with associated liquids, which the meters at the wellhead would have measured if the meters were accurate. LEC argues that Edwards' theory of liquid hydrocarbon recovery and measure of damages does not prove lost or missing liquid hydrocarbons, but only reflects differences between two sets of meters.

LEC called Don McGee to testify that variations between the field meters (at the wellhead) and the meter at the discharge at the TP–1 compressor (re-delivery point) was .7% on an Mcf basis and 2.5% on an MMBtu basis. McGee also testified that TPP's projected condensate recovery involved 1.1 gallons of condensate per Mcf. LEC called Lloyd Petticrew, who testified that LEC was doing a good job in measuring the gas but that free liquids could distort the measurement. Petticrew admitted that he was testifying based on his first experience in the Panhandle Field and admitted that he did not know how the system was operated in 1984, 1985 or 1986. Petticrew testified that he examined the meters at the TP–1 station, the point of re-delivery used by LEC pursuant to the contract, to determine the volume of gas to be credited to TPP. There, a mechanical separator had been installed to remove free liquids and none were found in the gas stream at the point of measurement. Petticrew testified that meters at the point of re-delivery are more accurate than the field meters because they measure gas that is in a condition better suited for accurate measurement, i.e., without free liquids and at a higher pressure. Petticrew concluded that LEC was doing the best it could and that LEC's data was better than no data at all.

TPP presented evidence to dispute any inference that the loss of condensate between the points of delivery and re-delivery was a metering problem rather than the result of actual removal of hydrocarbons from the system. Edwards testified that the meters were equally accurate and disagreed that there was high liquid at the field meters on a routine basis. Ron Briggs also testified that the conditions which con-

cerned Petticrew would not substantially affect the composition of the gas.

TPP's employee, Greg Sargent, who was in charge of field operations, testified that he was unaware of any condensate (liquids) being stolen or unaccounted for. LEC's District Supervisor, Homer Brooks, testified that every load of condensate was accounted for by load tickets. Carroll Beaman testified that American Star removed only condensate to which it was entitled. However, TPP argues that it was not credited with revenues from condensate removed and either given away or sold.

In summary, we find there was sufficient probative evidence to support the jury's findings as to overcharges and unaccounted-for hydrocarbons. Appellant's third point is overruled.

■ In its fourth point, LEC complains that the trial court erred in rendering a declaratory judgment that certain properties were additions and modifications to the original gathering system under the Gas Gathering and Compression Agreement of September 9, 1983. Article VI of the agreement provided:

> B. In the event this Agreement terminates under any of the conditions set out in Paragraph above, then Shipper [TPP] shall be allowed to continue to have its gas, produced from the properties shown in Exhibits "B" and "C", gathered and compressed in the Gathering System under terms to be negotiated at that time. Notwithstanding anything to the contrary contained herein, the Gathering System shall be left by Gatherer at the termination of this Agreement for the use and benefit of Shipper, if Shipper so desires, as the same exists at the time of such termination; provided, however, that Shipper shall be obligated to pay at least a bona fide salvage price for the Gathering System in place if Shipper desires to continue to have its gas gathered and compressed through the Gathering System at the time of termination.

Article I(M) of the contract provided:

> (M) The term *"Gathering System"* shall mean that gas gathering pipeline system and related compressors owned and operated by Gatherer in Hutchinson County, Texas, and shown on Exhibit "A" attached hereto and made a part hereof for all purposes, and all additions, modifications, and changes thereto.

The trial court rendered the following declaratory judgment:

> (2) Based upon the jury findings to Issue Number 2e, IT IS FURTHER ORDERED, ADJUDGED AND DECLARED that the following items are additions and modifications of the gas gathering system in place pursuant to the terms of the Gas Gathering and Compression Agreement between the parties dated September 9, 1983:
>
> (a) Drips, associated fuel lines, associated condensate lines, separation equipment and booster compressors utilized to gather and compress TRANS–PAN PIPELINE COMPANY'S gas pursuant to the Gas Gathering and Compression Agreement.
>
> (b) Gas transmission lines previously used to transport gas from the REO–Barnhill Compressor Station to the Canadian River Gas Processing Plant.
>
> (c) The equipment, including compressors, located at the REO–Barnhill Compressor Station.
>
> (d) The gathering system utilized to gather and compress gas from the wells drilled and operated by American Star Energy and Minerals Corporation.

LEC argues that the declaratory judgment in this suit does not put an end to any controversy and will be inapplicable in the future. It argues that TPP's right to repurchase the TP Gathering System given in Article VI(B) specifically provides that TPP's right of repurchase is to the system "as the same exists at the time of such termination." The jury found termination had not occurred and, LEC argues, it is impossible to determine what will be additions and modifications in the future.

LEC's complaint that the trial court's conclusion was clearly erroneous is alleged as a "no evidence" point. *See Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982). In reviewing a no evidence point, only the

evidence favorable to the determination, together with all reasonable inferences therefrom, is considered and conflicting or contrary evidence is ignored. *Rourke v. Garza*, 530 S.W.2d 794, 799 (Tex.1975).

Edwards stated that the entire set of gathering and compression facilities shown on Plaintiff's Exhibit 2 constituted additions, modifications or changes to the original 1983 TP system. He stated that all the lines were installed or used to carry gas to the Canadian River Plant. LEC's Homer Brooks agreed that all of the gas flowing to the Canadian River Plant was gathered into a single line prior to December 15, 1985. Brooks testified that work done at the Canadian River Plant included only two charge numbers for cost accounting. One charge number was for the "TP" System and the other charge number was for both the "JS" and "REO–Barnhill" systems.

Another LEC employee, Fred Crum, testified concerning the way LEC utilized all of the gathering lines in Hutchinson County to accept gas, commingle the gas, and transport it to the Canadian River Plant. Crum stated that certain gas from Jaten and American Star wells could not get to market without utilization of the TP system and the line from the TP–1 compressor station to the Canadian River Plant.

Allen Tarbutton, executive vice-president of LEC, testified that gas continuously flowed in the "TP Gas Gathering System" until the present time. He testified that, in order to save costs, the "JS System" and "TP System" were not operated separately or in isolation. Tarbutton stated that LEC in-house correspondence considered the entire system ("JS", "TP", "Barnhill" and "Canadian River/TP–Line") simply "the Canadian River Plant Gathering System."

The question of whether the "JS System" and the "REO–Barnhill System" were a part of the "TP System" was submitted to the jury at LEC's request. No objection was made by LEC to Special Issue 2(e), nor was the submission of the issue conditioned on any other finding. LEC's failure to challenge on appeal the jury's answer to Special Issue 2(e) precludes any complaint of the trial court's declaratory judgment which was based upon that answer. *Crain v. Hill County*, 613 S.W.2d 367, 369 (Tex. Civ.App.—Waco 1981, writ ref'd n.r.e.).

Special Issue 2(e) does inquire about the gathering system in place on the date of alleged termination, rather than the system in place at the time of trial or at the time of controversy with American Star. However, LEC failed to object on this basis and, accordingly, has waived this complaint. *Bundick v. Weller*, 705 S.W.2d 777, 781–82 (Tex.App.—San Antonio 1986, no writ); Tex.R.Civ.P. 274.

Since Special Issue 2(e) is unchallenged and will independently support the judgment, there is no basis for disturbing the declaratory relief. *Allen v. American National Insurance Company*, 380 S.W.2d 604, 609 (Tex.1964); *Hays v. Starling*, 619 S.W.2d 14, 15 (Tex.Civ.App.—Fort Worth 1981, no writ).

LEC next complains that the declaratory relief did not put an end to any controversy and is not applicable in the future. The declaratory relief does not purport to declare the condition of the gathering system at a future date, nor is it required to do so. So long as the judgment serves a useful purpose, it is valid, even if actual or potential disputes remain. *Town of Griffing Park v. City of Port Arthur*, 628 S.W.2d 101, 102 (Tex.App.—Beaumont 1981, writ ref'd n.r.e.).

TPP and TPG argue that several actual controversies were affected by the declaratory judgment rendered in this cause. These controversies involve the competing claims of TPP and TPG, and American Star and Jaten, to purchase the gathering system, as well as the obligation of LEC to transport TPG's gas through the system.

Prior to the actual trial of this case, American Star and Mineral Corporation was permitted to intervene, seeking a declaration of what property it was entitled to purchase from LEC under its purchase option. Intervenor's Third–Party Complaint alleges that American Star was given a right by LEC to purchase any and all of LEC's gathering facilities used to collect gas and condensate from American Star or Jaten and deliver it to the Canadian River

Plant. The Third–Party Complaint sets out the conflicting positions of TPP and TPG, and American Star: both interests had the option to buy the same gathering facilities. At trial, Carroll Beaman, the president of American Star, testified that the gathering system it was entitled to buy included that portion of the system referred to by LEC as the "TP System."

The trial court severed the claims of American Star and docketed them as a separate cause. The severance order directed that American Star's claims against LEC to purchase the property and the priority of the competing purchase claims of American Star and TPP and/or TPG would be determined in a separate action. The instant case involved the determination, as between LEC and Plaintiffs (TPP and TPG), of what property would be involved in TPP's and TPG's purchase option.

Based upon LEC's request for declaratory relief contained in its Third Amended Original Answer, Paragraph IV, COUNTERCLAIMS 4.4(c), the trial court declared that the gathering system identified in the Contract for Sale and Gathering and Compression Agreement was not limited to that property described in Exhibit "A" to those agreements, but included all of the additions, modifications and changes found by the jury in answer to Special Issue 2(e).

The declaration identifying the gathering facilities in place was relevant to present controversies and present issues. Even if the import of the declaratory judgment had been limited only to a future termination of the contract, the existing controversy due to American Star's option to purchase the same gathering facilities that TPP and TPG had the option to purchase, prevents the judgment from being an advisory opinion. Appellant's fourth point is overruled.

In its fifth point of error, LEC complains that the trial court erred in awarding attorney's fees directly to the attorneys for TPG, TPP and Edwards. In response to the jury's answer to Special Issue 17, the trial court awarded attorney's fees of $2,361,660.44 directly to the firm of Gassaway, Gurley, Sheets & Mitchell, and attorney's fees of $2,361,660.45 directly to Rain, Harrell, Emery, Young & Doke.

LEC argues that, as a matter of law, attorney's fees based solely upon a contingent fee contract cannot be awarded as damages in addition to other damages awarded to the prevailing party. Second, LEC argues that the award of attorney's fees is manifestly excessive and that remittitur is necessary. Third, LEC argues that, as a matter of law, attorney's fees cannot be awarded directly to appellees' attorneys.

LEC relies upon *Southland Life Ins. Co. v. Norton*, 5 S.W.2d 767 (Tex.Comm'n App. 1928, holding approved) for the proposition that all awards based on contingent fees are to be disallowed. However, *Norton* held that article 4736 of the Revised Civil Statutes of Texas 1925 provided for a reasonable attorney's fee for the prosecution and collection of a loss. *Id.* at 768. It went on to hold that the court must look at the testimony in the record and, combined with the court's "own common knowledge and experience as lawyers and judges" find a reasonable attorney's fee. *Id.* at 769.

This Court, in *Texas Farmers Ins. Co. v. Hernandez*, 649 S.W.2d 121 (Tex.App.—Amarillo 1983, writ ref'd n.r.e.), held that an award of attorney's fees as a percentage of the plaintiff's actual damages in a contract action is proper. The Court held that the "stated purpose of the statute is to permit the recovery of reasonable, usual and customary attorney's fees." *Id.* at 125. The Court held that contingent fee evidence will support an award of attorney's fees under article 2226, Texas Revised Civil Statutes Annotated (Vernon 1982), if the evidence satisfies the test of the statute, is otherwise admissible, and is sufficiently detailed to permit the fact finder to calculate the award. *Id.*

■ Recovery of attorney's fees in a contract action is today governed by section 38.001, *et seq.*, of the Texas Civil Practice and Remedies Code Annotated (Vernon 1986). Reasonableness of the fee is still the standard of review. *See Houston Lighting v. Russo Properties*, Inc., 710 S.W.2d 711 (Tex.App.—Houston [1st Dist.] 1986, no writ). Therefore, we must look to the testimony at trial on the reasonable-

ness of the attorney's fees to determine if the awards were "manifestly unjust" or based on sufficient evidence. As conceded by appellant, a contingency fee agreement is merely one of the factors a trial court may take into account in determining a reasonable fee. *Mecey v. Seggern*, 596 S.W.2d 924, 929 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.).

Wayne Barfield testified that he was familiar with fees customarily charged in the Amarillo area and that a fair contingent fee in the case at bar would be approximately twenty-five per cent (25%).

LEC called former District Judge George Dowlen, who testified that he was familiar with reasonable attorney's fees for commercial litigation and reasonable contingent attorney's fees in the Amarillo area. He stated that as a judge, he had approved many contingent fee rates of thirty-three per cent (33%). He stated that the three factors in determining the reasonableness of the fee are the amount of money involved, the amount of time, and the complexity of the case. He stated that contingent attorney's fees in a case such as the one at bar could go as low as ten per cent (10%) or as high as twenty-five per cent (25%). We find there was sufficient probative evidence to support the jury findings as to the amount of reasonable attorney's fees.

■ LEC next complains that attorney's fees cannot be awarded directly to the law firms. In response, appellees initially argue that this complaint has not been properly preserved for appellate review because LEC did not specifically mention that ground in argument upon its motion for judgment n.o.v. and objection to the form of the judgment. However, LEC's complaint on that basis made in the instrument denominated as LEC's Motion to Modify and Reform Judgment and Motion for New Trial together with the request for a ruling on its post-trial motions was sufficient to preserve the question for our review. *See* Tex.R.App.P. 52(a). None of the appellees take issue with this award. That being the case, they are effectively estopped by the judgment from seeking to impose further liability for attorney's fees upon LEC. *Goldberg v. Goldberg*, 392

S.W.2d 168, 170 (Tex.Civ.App.—Fort Worth 1965, no writ). Therefore, even if the direct awards to the attorneys were error, those awards would not affect the total amount due by LEC to discharge its debt under the judgment and appellant has no basis to make complaint. *Yorfino v. Ferguson*, 552 S.W.2d 563, 564–65 (Tex.Civ.App.—El Paso 1977, no writ); *Rampy v. Rampy*, 432 S.W.2d 175, 176–77 (Tex.Civ.App.—Houston 1968, no writ); *A.J. Rife Construction Co. v. Brans*, 298 S.W.2d 254, 259 (Tex.Civ.App.—Dallas 1956, writ ref'd n.r.e.); *Gulf, C. & S.F. Ry. Co. v. Cooper*, 33 Tex.Civ.App. 319, 77 S.W. 263, 266 (1903, no writ). Appellant's fifth point is overruled.

■ In its sixth point, LEC complains that the trial court erred in awarding prejudgment "Cavnar" interst of ten per cent (10%) per annum on contractual damages awarded appellees. Although appellees requested only six per cent (6%) prejudgment interest in their proposed judgment, the trial court, following *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985), awarded ten percent per annum prejudgment interest.

Both appellant and appellees acknowledge in their briefs that the Texas Supreme Court's holding in *Perry Roofing Company v. Olcott*, 722 S.W.2d 538 (Tex.App.—Fort Worth 1986), *aff'd*, 744 S.W.2d 929, 930–31 (Tex.1988) is dispositive of this point. The Court recently held in *Perry Roofing* that *Cavnar's* rationale to allow recovery for equitable prejudgment interest is correctly extended to application in breach of contract actions for unascertainable damages. *Id.* Thus, the trial court's action in awarding ten per cent (10%) per annum prejudgment interest in this case was correct. Appellant's final point is overruled.

All of appellant's points having been overruled, and there being no reversible error, the judgment of the trial court is affirmed.