The **WHITE BUDD VAN NESS PARTNERSHIP, Appellant,**

v.

**MAJOR–GLADYS DRIVE JOINT VENTURE, Appellee.**

**No. 09–89–074 CV.**

Court of Appeals of Texas, Beaumont.

Sept. 6, 1990.

Rehearing Denied Oct. 4, 1990.

Guy Lipe, Vinson & Elkins, Houston, for appellant.

Jon B. Burmeister, Moore, Landrey, Garth & Jones, Beaumont, for appellee.

Before BROOKSHIRE and BURGESS, JJ., and SMITH, J.[1], (Ret.).

## OPINION

BROOKSHIRE, Justice.

This is a suit to recover damages from an architectural firm, Defendant/Appellant, for its alleged failure to properly investigate and advise Plaintiff/Appellee concerning the use of a specific type of tile in the construction of a shopping center. Plaintiff/Appellee joined the contractor as a defendant for improper installation of the tile. Prior to trial, Plaintiff/Appellee settled with the contractor, entered into a so-called "Mary Carter" agreement with the contractor, and obtained a dismissal of the contractor from the suit. Based on jury findings, the court entered judgment for Plaintiff/Appellee against Defendant/Appellant in the sum of $498,157.40, plus appellate attorneys' fees.

Plaintiff/Appellee, a small group of persons, formed the Major–Gladys Drive Joint Venture to develop certain properties into a shopping center. Plaintiff/Appellee was not knowledgeable in the field of architecture and entered into a contract with Defendant/Appellant to serve as architects.

After hiring Defendant/Appellant and receiving cost estimates, it became apparent to Plaintiff/Appellee that it needed to cut costs in the building of the shopping center. "C–Tile" was less costly than the proposed material but the parties were not familiar with its usage, characteristics or costs. The use of "C–Tile" was suggested as a possible alternative. Defendant/Appellant was not familiar with "C–Tile" but looked into the product. As a result of its inquiries, Defendant/Appellant advised the Plaintiff/Appellee that the "C–Tile" could be used on the project and would be less costly. Relying on Defendant's/Appellant's advice, Plaintiff/Appellee approved the use of "C–Tile" on the project. The end result was that the "C–Tile" started coming loose and eventually had to be replaced.

Problems arose with the "C–Tiles". The "C–Tiles" were not sticking down. There were other problems with the "C–Tile". The tile had problems with weight bearing. The lack of weight-bearing quality resulted in the "C–Tile" becoming damaged. This "C–Tile" had not been used on other projects; it was a new product.

A witness who had been formerly associated with White Budd Van Ness testified that there were a number of problems with the "C–Tile". This witness said that he would not have put any tile in the weight-bearing areas had it been quarry tile or "C–Tile". He suggested, instead, the use of concrete or Bomanite. This witness repeated that he would not have put any kind of tile in the weight-bearing areas, including, of course, "C–Tile". He agreed the "C–Tile" was a fairly new product. The "C–Tile" was a substitute for Bomanite. The contractor said he could not install Bomanite. A non-architect, with White Budd Van Ness, at one point, advised the Joint Venturers that the Bomanite could not be installed. The Plaintiff's/Appellee's contentions were that the architect did not adequately investigate the "C–Tile" and its characteristics. This witness and the licensed architect in charge of the shopping center reviewed the tile situation. The witness stated that it was agreed between him and the architect that tile of any type should not be used in the trucking area and that a concrete strip was installed at about the same time that the "C–Tile" change order was approved. This witness testified that the members of the Joint Venture did not have knowledge of an architectural nature. The problem with the "C–Tile" triggered the litigation. Plaintiff/Appellee filed the present lawsuit against all parties involved but, as noted above, the only defendant left in the lawsuit by time of trial was the Defendant/Appellant.

The jury, in response to certain special issues or questions, found that the architects' partnership represented that the "C–

---

**1.** The Honorable Jackson B. Smith, Jr., retired, Court of Appeals, First District at Houston, sitting by assignment.

Tile" and/or architectural services had sponsorship, approval, characteristics, ingredients, uses, benefits or qualities which the tile, or the architectural services, did not have; that the architects represented that the "C–Tile" and other architectural services were of a particular standard, quality or grade, of which they were not; represented that the architectural agreement (contract) conferred or involved certain rights and remedies, which the agreement did not have; the architects failed to disclose to the Venture information concerning the "C–Tile", and/or architectural services which were known at the time of the execution of a certain, crucial change order; and, that such failure to disclose and to inform the Joint Venture of such information was intended to induce the Plaintiff/Appellee into a transaction which the Plaintiff/Appellee would not have entered into if such correct information had been disclosed. The jury found Defendant/Appellant Partnership engaged in unconscionable action or a course of action. The jurors found the Partnership committed the acts and failures immediately listed above and each was a producing cause of damages to the Plaintiff's/Appellee's venture.

In addition, the jury found that the architectural firm approved tile that was not suitable for the purpose for which the tile was to be used, while having reason to know of such purpose and of the Plaintiff's/Appellee's reliance upon the Defendant's/Appellant's skill or judgment to approve suitable tile. In answer to a separate question, the jury found that the Partnership breached in several respects its contract with the Plaintiff/Appellee and that the several breaches were each a proximate cause of damages. The special verdict determined that, in breaching the contract, the architects were negligent in performing certain services; and, specifically, that the partnership was negligent in the investigation of the tile, in advising the Plaintiff/Appellee as to the tile's proper use, in the proper preparation of plans and specifications, and in inspections of the installation of the tile. Also, a finding was returned that the Partnership failed to perform architectural services pertaining to the "C–Tile" in a good and workmanlike manner.

Gary Clark Contractors, Inc., was a Defendant. The jury found that Contractors, Inc., failed to comply with its agreement with the Plaintiff/Appellee and that the failure was a proximate cause of the damages and that Contractors, Inc., caused 20% of the damages and that The White Budd Van Ness Partnership caused 80%.

Significantly, in Special Issue No. 16, the jury found that the Van Ness Partnership knowingly made some of the representations or knowingly engaged in the conduct inquired about in Special Issue No. 1 set out below, in summary:

"SPECIAL ISSUE NO. 1

"Do you find from a preponderance of the evidence that the Defendant, WHITE BUDD VAN NESS PARTNERSHIP committed any of the following acts which were a producing cause of damages, if any, to Plaintiff?

"A. Represented that the 'C–Tile' and/or the architectural services had sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities, which it did not have.

"ANSWER 'WE DO' or 'WE DO NOT':

"ANSWER: *We do*

"B. Represented that the 'C–Tile' and/or the architectural services were of a particular standard, quality, or grade which it was not.

"ANSWER 'WE DO' or 'WE DO NOT'.

"ANSWER: *We do*

"C. Represented that the architectural agreement confered [sic] or involved rights, or remedies which it did not have.

"ANSWER 'WE DO' or 'WE DO NOT':

"ANSWER: *We do*

"D. Failed to disclose to Plaintiff information concerning the 'C–Tile' and/or architectural services which was known at the time of the execution of Change Order No. 3, when such failure to inform Plaintiff of such information was intended to induce the Plaintiff

into such transaction which the Plaintiff would not have entered into if such information had been disclosed.

"ANSWER 'WE DO' or 'WE DO NOT':

"ANSWER: *We do*

"E. Engaged in any unconscionable action or course of action.

"ANSWER 'WE DO' or 'WE DO NOT':

"ANSWER: *We do*

"F. Furnished or selected tiles that was [sic] not fit for the ordinary purposes for which tile is used.

"ANSWER: 'WE DO' or 'WE DO NOT':

"ANSWER: *We do not*

"G. Approved tile that was not suitable for the purpose for which the tile was to be used, while having reason to know of such purpose and of Plaintiff's reliance on the Defendants' skill or judgment to approve suitable tile.

"ANSWER 'WE DO' or 'WE DO NOT':

"ANSWER: *We do*

"An 'unconscionable action or course of action' is an act or practice that, to a person's detriment, either: (a) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or (b) results in a gross disparity between value received and consideration paid, in a transaction involving transfer of consideration."

Basically, then, this cause of action can be described as an architect malpractice suit.

### One of Appellant's Basic Positions

The Appellant argues that the liability provisions of TEX.BUS. & COM.CODE ANN. Sec. 17.46(b) (Vernon 1987) have no application to professional architects' services; hence, the trial court erred in overruling the Appellant's Motion for Directed Verdict and for a Judgment Notwithstanding the Verdict.

As to Special Issues No. "1 A", "1 B", and "1 C", Appellant tacitly concedes, we think, that the trial court submitted these three issues to the jury as alleged violations of three of the so-called "laundry-list" provisions of TEX.BUS. & COM.CODE ANN. Sec. 17.46(b) (Vernon 1987), of the Texas Deceptive Trade Practices Act, and, especially, Sec. 17.46(b), (5), (7), and (12). TEX.BUS. & COM.CODE Sec. 17.46 (Vernon 1987) declares certain acts and practices unlawful.

Asserting that these specific provisions of the DTPA are strict liability provisions, requiring only proof of innocent misrepresentations and requiring no proof of intent to deceive; Appellant vigorously contends that these special questions were improperly submitted to the jury. Hence, they cannot form a basis of a judgment against the architectural partnership *because these provisions have no, and can have no, applicability to a cause of action grounded on alleged professional malpractice.* Simply put, the DTPA can have no application to professional architectural services.

■ Of significance and interest is TEX. BUS. & COM.CODE ANN. Sec. 17.44 (Vernon 1987) which mandates that this Act shall be liberally construed and applied in order to promote its underlying purposes. The purposes are declared to be those which protect the consumers against false, misleading and deceptive business practices, unconscionable actions and breaches of warranty and the purposes are *to provide efficient and economical procedures to secure such protection.* We conclude that Sec. 17.44 clearly declares the Legislature's intention.

In *Heath v. Herron,* 732 S.W.2d 748 (Tex.App.—Houston [14th Dist.] 1987, writ den.), the Court wrote, at page 754:

"We are aware that legal services are actionable under the DTPA. *See, e.g., DeBakey v. Staggs,* 612 S.W.2d 924 (Tex. 1981). . . ."

### Professional Services and Unconscionable Action

The Supreme Court, in *Willis v. Maverick,* 760 S.W.2d 642 (Tex.1988), wrote, at page 647:

"Accordingly, it becomes unnecessary to address Maverick's contention that the DTPA is not applicable to this cause of action. In concluding thus, we recognize that we have previously held a lawyer's

unconscionable conduct to be actionable under the DTPA. *DeBakey v. Staggs,* 612 S.W.2d 924 (Tex.1981)...."

It is a truism to state that, in the United States, legal and architectural services are professional. Because the jury found, specifically, that the partnership engaged in unconscionable action, or an unconscionable course of action, we hold that the DTPA is applicable to the professional services or, as characterized by one brief, to architecture malpractice. TEX.BUS. & COM.CODE ANN. Sec. 17.45(5) (Vernon 1987) reads:

"(5) 'Unconscionable action or course of action' means an act or practice which, to a person's detriment:

"(A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

"(B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration."

Under this definition and the jury's special answers, we conclude that the DTPA is applicable and forms a valid basis for the judgment. We overrule this contention of the Appellant.

The Eastland Court of Appeals, in 1981, held that a widow's claim for worker's compensation benefits, for the death of her husband, was barred since the claim was not filed within six months after the husband's death; but the widow had the right to proceed against her first attorney for the benefits to which she would have been entitled. The court held that the widow could seek damages under the Deceptive Trade Practice–Consumers Protection Act, TEX.BUS. & COM.CODE ANN. Sec. 17.41 et seq. (Vernon 1987). *Texas Emp. Ins. Ass'n v. Tobias,* 614 S.W.2d 901 (Tex.Civ. App.—Eastland 1981, writ dism'd). It seems clear to us that the *Tobias, supra,* case is a decisional precedent allowing a recovery under the DTPA for professional malpractice.

In *Barnard v. Mecom,* 650 S.W.2d 123 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.), the unanimous court affirmed a judgment against an attorney-at-law. The Appeals Court reasoned that the trial court found that the attorney had committed an unconscionable action because the attorney took advantage of the client's lack of knowledge, ability, experience and capacity to a grossly unfair degree and because there was a gross disparity between the amount paid by the client and the value the client received from the attorney. The Corpus Christi Court based its affirmance on TEX. BUS. & COM. CODE ANN. Secs. 17.45(5) and 17.50(a)(3) (Vernon Supp.1982), further finding that the actions of the attorney were a producing cause of actual damages. The trial court also applied Sec. 17.50(b)(1) to increase the award to a total of $11,000.00 in damages; this $11,000.00 award was affirmed. We conclude that the well-reasoned case of *Barnard, supra,* undergirds our resolution and rejection of Appellant's contention.

### Special Issue No. 16 and Its Instruction

Furthermore, it must be stressed that the jury found that the partnership knowingly made representations in Special Issue No. 1, or knowingly engaged in conduct inquired about in Special Issue No. 1. These matters are inquired about in Special Issue No. 16. Issue No. 16 with predicate reads:

"If you have answered Special Issue No. *1* or any subpart thereof 'We do', then answer Special Issue No. *16;* otherwise do not answer Special Issue No. *16.*

"SPECIAL ISSUE NO. 16

"You are instructed that 'knowingly' means actual awareness by Defendant WHITE BUDD VAN NESS PARTNERSHIP of the falsity or deception, if any, of the representations made by Defendant, if any, but actual awareness may be infered [sic] where objective manifestations indicate that a person acted with actual awareness.

"Do you find from a preponderance of the evidence that the Defendant WHITE BUDD VAN NESS PARTNERSHIP either (1) knowingly made any of the rep-

resentations or (2) knowingly engaged in the conduct inquired about in Special Issues [sic] No. 1?

"ANSWER 'WE DO' or 'WE DO NOT':

"ANSWER: *We do*"

We construe the jury's answer to Special Issue No. 16, finding "knowingly made" and "knowingly engaged", in the matters inquired about in Special Issue No. 1, to be equivalent to and tantamount to a finding that the Appellant violated the standard of professional care which an architect, under the substantive law, is under a duty to render to clients.

### The Negligence Issues and Their Instruction

But, in a separate series of issues, the jury found that the Van Ness Partnership was negligent in their investigation of the tile (the "C–Tile"); that the Partnership was negligent in advising the Plaintiff/Appellee as to the tile's proper use; further, negligence was committed in the preparation of the plans and specifications and negligence was committed in the inspections of the installation of the tile. These several negligences were found by the jury to be a proximate cause of the damages to the Venture.

Furthermore, a careful reading of the instructions and definitions, especially concerning negligence, ordinary care and proximate cause, as those definitions relate to the conduct of the Van Ness Partnership, clearly form a basis for the judgment entered below when the entirety of the verdict and the entirety of the record is considered and analyzed. Again, it must be remembered that the jury found unconscionable actions which were committed by the partnership. Hence, the Appellant's reliance upon *DeBakey v. Staggs*, 612 S.W.2d 924 (Tex.1981) is not sound. We simply cannot agree with the Appellant's thrusting argument that liability has been imposed on professionals merely by virtue of innocent representations. We respectfully make rejoinder and say that their contention is disproved by the record before us.

Next, the Appellant ably argues two points of error, stating that the evidence is legally insufficient to sustain the jury's answers to Special Issues No. 1(A), 1(B), and 1(C) and also that the evidence is factually insufficient to sustain the jury's answers to the same special issues. We have endeavored to apply the correct, accepted and well-established standards of review as to legal insufficiency—no evidence. We have also endeavored to review the factually insufficient point. We overrule both contentions. *See In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); R. Calvert, "'No Evidence' and 'Insufficient Evidence' Points of Error", 38 TEXAS L.REV. 361 (1960); W. Garwood, *"The Question of Insufficient Evidence on Appeal"*, 30 TEXAS L.REV. 803 (1952).

Furthermore, we perceive that a large part of the work on this shopping center project was, in fact, performed by a draftsman who was not an officially-licensed architect. We are persuaded, under this record, to conclude that the issue of professional liability could be passed on by a jury without the formal declaration of a licensed architect reciting the language contended for by Van Ness. Nevertheless, this is not the paramount holding or reasoning on this point.

The Appellant also challenges and attacks the jury's findings as to Special Issues Nos. 1(D), 1(E), 1(G), on the basis of no evidence and factually-insufficient evidence. Special Issues 1(D), 1(E), 1(G) and the answers are copied above. The Appellee, with candor, concedes that the Appellant was not a seller of tile as that term was defined in TEX.BUS. & COM.CODE Sec. 2.103(a)(4) (Vernon 1968). Therefore, Special Issue No. 1(G) should not have been submitted; but we determine this to be harmless error.

We have reviewed the record and conclude that there is evidence of probative force and valuation to sustain the jury's findings to Special Issues Nos. 1(D) through 1(E). TEX.BUS. & COM.CODE Sec. 2.103(a)(4) defines "Seller" as meaning a person who sells or contracts to sell goods. In view of the other issues and

answers in this cluster of issues, we determine that Special Issue No. 1(G) and its submission, were harmless.

It is interesting and significant that there is evidence of probative force that a certain employee of the architectural partnership was, under all the surrounding circumstances, reasonably thought to have been an architect by certain members of the Venture. In fact, the employee was not an architect. The record reflects that some of the venturers relied upon the non-architect's representation about the "C–Tile". The record also reflects that, had the venturers known that the draftsman was not an architect, they would not have followed his recommendations but rather would have sought expert advice of an architect.

This opinion does not have the desired quality of brevity. Hence, after applying the well-recognized standards of review, we overrule Appellant's Points of Error 5, 6, 7, 8, 12, 13, 14, 15 and 16. Points of Error 5, 6, 7 and 8 attack the legal and factual sufficiency of the jury's answers to Special Issues 1(D) and 1(E). Appellant's Points of Error 12 and 13 challenge the answers to Special Issue No. 2. Points of Error 15 and 16 argue both evidentiary insufficiencies (legal and factual) to Special Issue 2(A). Special Issue 2 asked about the Partnership's negligence, if any. Special Issue 2(A) asked about whether the services of Van Ness pertaining to the "C–Tile" were performed in a good and workmanlike manner. We hold that Appellant's Points of Error Nos. 9, 10 and 11 address a harmless error in submitting Special Issue 1(G) and these points will not reverse the judgment below nor cause a remand.

### The Implied Warranty of Workmanlike Performance

■ On another tack, the Appellant argues that the implied warranty of good and workmanlike performance of services simply does not apply to the professional services involved. The reasoning, rationale and opinion in *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349 (Tex.1987), is of special significance. The Supreme Court wrote that the case was a Deceptive Trade Practices–Consumer Protection Act (DTPA) implied warranty cause of action. The jury had awarded discretionary damages. The jury had found a breach of implied warranty in that the repairs were not done in a good and workmanlike manner. The jury found, also, that Melody Home had knowingly breached this implied warranty. Jury findings existed that Melody Home failed to construct the modular, prefabricated, home in a good and workmanlike manner. The jurors decided this breach was a knowing one.

Based on these findings, the jury awarded $5,000.00 in discretionary damages under the TEX.BUS. & COM.CODE ANN. Sec. 17.50(b)(1) (Vernon Supp.1987). The case was appealed to the Fort Worth Court of Appeals for the Second Supreme Judicial District (708 S.W.2d 600). That Court of Appeals held, in substance, that the sale of a service carries with it the implied warranty that the service will be performed in a skillful and workmanlike manner affirming the judgment of the trial court.

The Fort Worth court disallowed the contention of Melody Home that the trial court had committed error in submitting special issues concerning special punitive and discretionary damages and in awarding such damages under the Deceptive Trade Practices Act. The judgment awarded damages and attorney's fees under the Act even though the failure to make repairs in a good and workmanlike manner was not listed in TEX.BUS. & COM.CODE ANN. Sec. 17.46(b) (Vernon Supp.1986) nor at any place elsewhere in the Act as a Deceptive Trade Practice.

Justice Hill, for the Fort Worth Court, held and reasoned that the sale and furnishing of a service carries with it the implied warranty that the service will be performed in a skillful and workmanlike manner. A further holding was that TEX. BUS. & COM.CODE ANN. Sec. 17.50, as it was amended in 1979, was applicable to the Melody Home case. Neither was it required that an actual finding of a deceptive trade practice was necessary nor that an alleged act be false, misleading or decep-

tive in nature, as listed under Sec. 17.46 of the Act. Nevertheless, penalty damages were recovered in the case of a breach of an express or implied warranty which had been *knowingly breached.* The affirmance by the Fort Worth Court of Appeals was, in turn, reaffirmed by the Supreme Court of Texas.

The Supreme Court of Texas forcefully noted that, during recent decades, the United States has shifted from a goods oriented to a service oriented economy and that, with this basic change, there has resulted a marked decrease in the quality of services. These stark problems, the high court observed, led that court and the legislature to apply the theory of implied warranty to products, goods and to new houses. The Court reasoned an examination of certain policies favors the extension of the theory of implied warranty to service transactions. The Supreme Court cited the famous Professor Prosser and his article, *The Assault Upon the Citadel,* 69 Yale L.J. 1099, 1120–24 (1960). The Court wrote, in *Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349 (Tex.1987), at pages 353 and 354:

"First, the public interest in protecting consumers from inferior services is paramount to any monetary damages imposed upon sellers who breach an implied warranty. Second, a service provider is in a much better position to prevent loss than is the consumer of the service. *Many services are so complicated and individually tailored that a consumer is unable to independently determine quality and must depend on the experience, skill, and expertise of the service provider.* [Footnote omitted] Third, *a consumer should be able to rely upon the expertise of the service provider.* The application of implied warranty to services would encourage justifiable reliance on the service providers who would have more incentive to increase and maintain the quality of the services they provide. Fourth, a service provider is better able to absorb the cost of damages associated with inferior services through insurance and price manipulation than is the individual consumer." (Emphasis added)

The Court reaffirmed the writing and reasoning of Justice Norvell in *Humber v. Morton,* 426 S.W.2d 554 (Tex.1968), as follows, at page 561:

" 'That *court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly,* and which discards the old rule when it finds that another rule of law represents *what should be according to the established and settled judgment of society,* and no considerable property rights have become vested in reliance upon the old rule. * * * ' " (Emphasis added)

The record reflects that the Appellant understood and realized that the Joint Venturers were not experienced nor trained in architecture. Because of this real situation, the Joint Venture necessarily had to rely on the advice of its architect.

The Court observed that the legislative history of the DTPA suggests that the Act was intended to apply to all service providers. The Court further noticed that certain proposals to amend the DTPA to exempt insurance agents, brokers and licensed professionals from the coverage of the Act were rejected. The Court wrote, in *Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d at 354:

"The question whether an implied warranty applies to services in which the essence of the transaction is the exercise of professional judgment by the service provider is not before us."

But the Court did not disallow such a concept, but quickly observed that attorneys' clients could sue under the DTPA for an attorney's unconscionable actions. In this present litigation, the Supreme Court can squarely settle the issue. We sanguinely decide that the paramount reasoning, rationale and judicial philosophy of *Melody Home Mfg. Co., supra,* possessing and enforcing hegemony over the overall opinion, dictates the result we reach.

Additionally, we note, in *Melody Home Mfg. Co., supra,* that Justice Mauzy con-

curred in all respects with the majority opinion. Justice Mauzy, previously Senator Mauzy, was the Senate sponsor of H.B. 417, the relevant legislation. Justice Mauzy wrote, at page 362:

"Predictability and stability in our law is not to be maintained at the cost of being wrong. Two wrong decisions do not make a right decision. The simple truth of the matter is that the dissent was right in 1985 and the majority was wrong ... 'Law must be stable and yet it cannot stand still.' Roscoe Pound, *Interpretations of Legal History* 1 (1923)."

....

"We must be willing to expand or limit the law dependent upon the perceived ills of a changing society. We must also be able to review even the most recent of decisions to determine if the rationales contained therein are still appropriate. Any other policy would be to insure a stasis in the laws of this State and would eventually deny the rights of the people whom we represent...."

Following the rationale of the Supreme Court, we are not justified in sustaining Appellant's Point of Error No. 14; it is overruled. Appellant's Point of Error No. 14 reads:

"The trial court erred in denying Defendant's Motion for Directed Verdict and Defendant's Motion for Judgment Notwithstanding the Verdict and in entering judgment for plaintiff because the implied warranty of good and workmanlike performance does not apply to the professional services involved in this case."

### The "Mary Carter" Agreement

The Appellant vigorously argues that the trial court fell into error by refusing to disclose the actual terms of the so-called "Mary Carter" agreement to the jury and in refusing to permit Appellant's counsel to cross-examine a certain witness concerning the "Mary Carter" agreement.

During September of 1988, the Plaintiff below and Gary Clark Contractors, Inc. (a defendant), entered into an agreement. Appellant characterizes it as a "Mary Carter" agreement. Appellant argues that Contractors', Inc., insurer paid to the Plaintiff/Appellee the sum of $100,-000.00. Plaintiff/Appellee agreed to prosecute further this action. If successful, Contractors, Inc., would recover one-half of the monies obtained, not to exceed $100,-000.00. A timely Motion in Limine was presented to the trial judge by the Plaintiff. The witness involved was Gary Clark. In large measure, Gary Clark's testimony was helpful to the Partnership. Clark was called to the stand by the Van Ness Partnership. Clark testified that the Contractors, Inc., properly supervised its work on the tile and that its work was done properly.

At that point, the counsel for the Partnership endeavored to impeach Clark with the "Mary Carter" agreement, in an effort to show his interest in the outcome of the case and any bias. This line of questions was disallowed. Considering the procedural posture involved, we do not perceive harmful error. But, if such error existed, it was in the nature of invited error on the part of the Partnership. Clark's evidence merely protected his corporation. It was not to the effect that the Appellant had done something wrong. Clark merely stated that his own work was properly done.

The classical rule in our State is that settlement agreements between the plaintiff and a co-defendant are to be excluded from the jury. If the plaintiff releases his cause of action against one joint tort-feasor and makes a promise to pay or to credit the settling tort-feasor (*who actually remains a party at the trial*) with a portion of the recovery obtained; then an exception to this rule is recognized.

Here, Contractors, Inc., was not a party at the trial. *See Clayton v. Volkswagenwerk A.G.*, 606 S.W.2d 15 (Tex.Civ.App.— Houston [1st Dist.] 1980, writ ref'd n.r.e.). The rule has been established that a party-litigant is not entitled to present before the jury otherwise inadmissible evidence merely to discredit or impeach testimony that that party, (here Van Ness), alone, has offered. That is our situation here. The strategy was a type or species in the na-

ture of invited error—if it was error at all. The same cannot result in a reversal. The Van Ness Partnership called Gary Clark. Gary Clark was not in the witness box to promote the Joint Venture's cause against the architectural firm. There was no "ganging up" on the Partnership.

The sole occasion that the evidence given by Gary Clark came into the trial procedure was *because the Appellant called him as a witness.* The rationale for the admissibility of a so-called "Mary Carter" agreement is simply not applicable in this case. There was no basis or reason for the jury being confused. The efficacy of the trial was not endangered. There was no misalignment of parties or misconception of the litigants or their respective positions.

It is also settled that a non-settling defendant may not call a settling defendant in an attempt to offer a "Mary Carter" agreement into evidence on the pretext of impeachment. We overrule Appellants' "Mary Carter" Point of Error No. 17. *See and compare Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1 (Tex.1986).

We find no merit in the Appellant's Point of Error No. 18 because of the introduction of certain evidence and various documents without objection. The matters complained of therein were waived. It is also important to note that the testimony was relevant to show that one Arthur Berry was exerting good faith efforts in a bona fide attempt *to lease all the vacant spaces at the shopping center.* Evidence, like a brilliantly-cut diamond, can possess several facets of admissibility.

Inasmuch as the monthly note owed by the joint venturers was above $13,000.00 vis-a-vis the actual monthly rental income of about $6,000.00 was a cogent fact that had probative force to show that Berry's efforts were substantial and vigorous. The Joint Venturers were in the position of being obliged to expend out of their personal monies some figure of around $7,000.00 per month. Hence, Berry had compelling motivation, as did the others, to exert his full efforts to lease all of the non-occupied premises.

### David Heldenbrand's Testimony as an Expert

■ The Appellant further advances that David Heldenbrand's testimony, as an expert, regarding architectural services, was not properly admissible and that the Court abused its discretion in permitting this expert testimony on the issue of whether the architectural services met the applicable and proper standard of care for architects. Heldenbrand's evidence was that he received a bachelor of science degree in biology. He had done actual, practical work for several contractors. He returned to school. He received a degree in civil engineering. He had held numerous, related jobs. He had worked for consulting firms. He had worked on different types of projects, including several concrete construction jobs.

He had had experience looking at tile jobs and also several jobs involving concrete projects and concrete failures therein. He was a member of the American Society of Testing and Materials as well as the National Society of Professional Engineers. He had consulted professional and learned treatises and publications. He was familiar with various characteristics of different types of tiles used in construction. He swore that he had had a good deal of experience with change orders during a project.

He testified that change orders, in his opinion, were incorporated as a part of the basic contract and agreement, if, as and when the change order was approved by the architectural firm.

Heldenbrand stated that his position was that Appellant's conduct and performance in question fell below that correct standard for an architect responsible for an architectural project or an engineering and architectural project. His evidence applied to a construction project as well. We think Heldenbrand was qualified to testify as to the standard of care of architects, this being a non-medical malpractice case. *See Stanley v. Southern Pacific Company,* 466 S.W.2d 548 (Tex.1971). We conclude that the fields of expertise of engineering and architecture overlap and are intertwined on the

questions and issues testified to by Heldenbrand. Certainly Heldenbrand's testimony, and his opinion, were probably helpful and salutary to the triers of fact. TEX. R.CIV.EVID. 702. Multiple and overlapping areas of training, schooling, expertise, experience, professionalism, engineering and architecture intertwine, overlay, coincide and intermingle to some significant extent in the area of the tile issue and the installation thereof.

### The Lost Rental Income

■ We disagree with the Appellant that the trial court fell into error by permitting evidence or testimony concerning the lost rental income. The witness was Arthur Berry. He was one of the co-owners of the shopping center. Hence, he could testify as to rentals. He testified to correct calculations. The calculations were based on rentals per square foot. He testified as to the actual collectable rentals, which demonstrated a meaningful difference. Berry was also the individual in charge of leasing the premises and the vacant, unoccupied spaces. He worked on a daily basis. He had experience over a number of years, except for certain brief periods of time, when a local real estate firm was attempting to lease the premises to third-party lessees in behalf of the Venturers. Furthermore, we conclude that the objection made by the Appellant was too general. The objection lacks specificity. We overrule this point of error.

### The Attorneys' Fees Issue

Appellant urges a grouping of points that attacks the awards of the attorneys' fees involved in favor of the Joint Venture. The contentions are that the evidence was legally insufficient to establish the reasonableness and necessity of the attorneys' fees and, in the alternative, the evidence was not based upon a presentation of the claim. *See and compare Plaza Nat. Bank v. Walker*, 767 S.W.2d 276 (Tex.App.—Beaumont 1989, writ denied). There, our Court made a square ruling, when it was contended that the Plaintiffs failed to allege and prove a written notification under the DTPA, that the petition upon which the

Plaintiffs went to trial alleged that all conditions precedent to Plaintiffs['] recovery had been performed or had occurred and when the other party failed to specifically deny that notice; then, the Plaintiffs were simply not required to prove it. *See Plaza Nat. Bank, supra*, at page 278. *See and compare Sanchez v. Jary*, 768 S.W.2d 933 (Tex.App.—San Antonio 1989, no writ); *City of Houston v. Flanagan*, 446 S.W.2d 348 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.).

In *Texas Farmers Ins. Co. v. Hernandez*, 649 S.W.2d 121 (Tex.App.—Amarillo 1983, writ ref'd n.r.e.), the court reasoned *that the stated purpose of the relevant statute was to permit and allow the recovery of a reasonable, usual and customary attorney's fees. Then the court reasoned that a contingent arrangement, and evidence thereof, would support an award of an attorney's fee* under TEX. REV.CIV.STAT.ANN. 2226 (Vernon 1971), repealed Sept. 1, 1985, and now codified as TEX.CIV.PRAC. & REM.CODE ANN. Sec. 38.001 (Vernon 1986), provided that the evidence is admissible and is of sufficient quality and detail to permit the finder of fact to calculate, *reasonably*, the amount of the award.

■ We find that the evidence is sufficient to show both the necessity for employment of legal counsel and the reasonableness of the attorney's fees as well as the reasonableness of the arrangement between the Joint Venturers and their counsel. We conclude, then, that the jury's award, concerning the attorney's fees, was reasonable, based on usual and customary attorney's fees in like cases.

Concerning the presentment contention, we must emphasize this appeal is similar and parallel to the situation in *Plaza Nat. Bank v. Walker*, 767 S.W.2d 276 (Tex.App.—Beaumont 1989, writ denied). In that case, we were presented with a point of error arguing that a party had failed to present a timely notice of his claim. Therefore, that party was not entitled to recover attorney's fees under either the DTPA or Section 38.001, et seq. of the Texas Civil

Practices and Remedies Code. In Walker's case, as in the case at bar, the Appellees had proceeded to trial upon allegations that all conditions precedent had been performed or had occurred.

The Appellees' pleadings here are virtually the same. Our Court determined that the Appellant bank, Plaza National, had failed to specifically deny the notice. Hence, Walker was not required to prove it. We adhere to *Plaza Nat. Bank, supra,* and overrule this contention. *See and compare Sanchez v. Jary,* 768 S.W.2d 933 (Tex.App.—San Antonio 1989, no writ); TEX.R.CIV.P. 93 and 94.

### Prejudgment Interest

■ The last three points urged by the Appellant advanced that the trial court erred in awarding prejudgment interest on the cost of repair damages and that the trial court erred in awarding prejudgment interest on the lost rental income damages. Also, Appellant insists the court erred in measuring such prejudgment interest at the rate of 10% per annum. The trial court allowed prejudgment interest from March 16, 1984, being six months after the date of the change order. Change order No. 3 was the change order in question. The No. 3 change order, itself, was of September 16, 1983. Change order No. 3 was directly relevant to "C–TILE". These damages were economic. This type of prejudgment interest is recoverable. *See Perry Roofing Co. v. Olcott,* 744 S.W.2d 929 (Tex.1988); *Rio Grande Land & Cattle Co. v. Light,* 758 S.W.2d 747 (Tex.1988); *City of Houston v. Wolfe,* 712 S.W.2d 228 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd). In *Liquid Energy v. Trans–Pan Gathering,* 758 S.W.2d 645 (Tex.App.—Amarillo 1988, case later settled), the Amarillo Court acknowledged that it had held that Cavnar's rationale, [*see Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985)], to allow recovery for equitable prejudgment interest had been extended to include breach of contract actions even for unascertainable damages. We quote from *Liquid Energy, supra,* at page 662:

"In its sixth point, LEC [Liquid Energy Corporation] complains that the trial court erred in awarding prejudgment 'Cavnar' interst [sic] of ten per cent (10%) per annum on contractual damages awarded appellees. Although appellees requested only six per cent (6%) prejudgment interest in their proposed judgment, the trial court, following *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985), awarded ten per cent per annum prejudgment interest.

"Both appellant and appellees acknowledge in their briefs that the Texas Supreme Court's holding in *Perry Roofing Company v. Olcott,* 722 S.W.2d 538 (Tex.App.—Fort Worth 1986), *aff'd,* 744 S.W.2d 929, 930–31 (Tex.1988) is dispositive of this point. The Court recently held in *Perry Roofing* that *Cavnar's* rationale to allow recovery for equitable prejudgment interest is correctly extended to application in breach of contract actions for unascertainable damages. *Id.* Thus, the trial court's action in awarding ten per cent (10%) per annum prejudgment interest in this case was correct. Appellant's final point is overruled."

### The Transcript of the Evidence or Statement of Facts Issue

■ Appellant's Point of Error No. 1 is that the trial court erred in overruling Defendant's Amended Motion for New Trial and in refusing to grant a new trial because it is averred that the Defendant, due to no fault of its own, could not obtain a properly certified, verbatim transcript of the evidence, in question and answer form. We determine that this first point of error lacks merit. The argument is that a portion of the trial was reported by a court reporter who, at the time, was not certified. The Appellant brings forward certain relied-upon cases.

In one case, *there was no Statement of Facts presented to the Appellate Court. Walzem, Inc. v. Romano,* 592 S.W.2d 20 (Tex.Civ.App.—Beaumont 1979, no writ). In another case, *there was no Statement of Facts brought forward because of the fact that the official court reporter's*

*notes were lost. Flowers v. Flowers,* 585 S.W.2d 334 (Tex.Civ.App.—Dallas 1979, no writ). In yet another case, *the court reporter had, through inadvertence, disposed of, or thrown away, his stenographic notes and could not prepare a statement of facts.* The cases relied upon by Appellant are meaningfully different from the record on this appeal.

There is a lengthy Statement of Facts in this record. We think the Appellant has not actually demonstrated that any question or answer therein was incorrectly reported. There was an audio tape made at trial. The trial took place in December of 1988. The first brief of Appellant was filed in November of 1989. During that period of time, the Appellant did not point out a factual discrepancy or mistake in the record. In fact, Appellant insists that, because the court reporter was uncertified, the Judgment should be summarily reversed and the cause of action summarily remanded for a new trial. We disagree. From our examination of the record, we perceive the same was correct and proper. Certainly, it was totally sufficient to allow the parties to prepare and correctly and excellently brief many points of error and many reply points. Appellant was certainly able to file an excellent Reply Brief.

Defendant/Appellant concedes, in its brief, that the reporter's notes and the audio tapes of the roving reporter were made and recorded during the trial. They were fully available. Also, they were available to the official court reporter of the 58th District Court and to the roving court reporter. The roving court reporter prepared Volumes 3 and 4 of the Statement of Facts. Again, Defendant/Appellant argues that these volumes are not true and correct. Defendant/Appellant does not attack any specific portion or question and answer in these volumes.

We conclude that if the roving court reporter situation created any error, it was harmless; it was certainly not reversible error. The reason is that no specific complaint has been made by the Defendant/Appellant about any part of the record or the statement of facts taken down, and transcribed, by the roving court reporter. Furthermore, it is very clear that there existed no error on the part of the District Judge inasmuch as the roving court reporter—the uncertified one—had been assigned to his court by the Presiding Judge under the local rules. The trial judge had no knowledge of the status of the roving court reporter. Indeed, the roving court reporter had been a substitute court reporter for about two years in the various courts of Jefferson County. Hence, the trial judge was not at fault in any way. Nor has the Defendant/Appellant specifically claimed or demonstrated any wrong or errors in the transcriptions of the testimony. Nor has the Defendant/Appellant shown any error or mistake in the work of the roving court reporter.

The dissent strongly relies on *Rogers v. Rogers,* 561 S.W.2d 172 (Tex.1978). That case is meaningfully different. It is certainly not controlling or even parallel. *Rogers, supra,* involved a default divorce judgment. The default judgment appointed Mrs. Rogers as managing conservator of the couple's infant son and made other important orders affecting the parent-child relationship. No statement of facts was brought forward. Mr. Rogers was unable to obtain any statement of facts. The Supreme Court held that TEX.FAM.CODE ANN. sec. 11.14(d) (Vernon 1988) required a record to be made in all suits affecting the parent-child relationship unless waived by all the parties with the consent of the trial court. *Rogers, supra,* is not in point. The dissent cites *Soto v. State,* 671 S.W.2d 43 (Tex.Crim.App.1984). *Soto, supra,* was a criminal proceeding. The trial court denied Soto's motion to have the court reporter take down the proceedings. Instead, an order was entered for the county clerk to tape record the proceedings. Later, a deputy county clerk took over. *Soto, supra,* is inapposite. In *Weaver v. Westchester Fire Ins. Co.,* 739 S.W.2d 23 (Tex.1987), Ray Weaver, in a workers' compensation action, filed a motion for a new trial, alleging improper outside influences had been unlawfully brought to bear upon the jury. The motion was supported by an affidavit. Weaver filed a written request for a court

reporter to take down the testimony offered in support of his motion. The trial court affirmatively refused Weaver's request. A hearing was conducted. At the conclusion thereof, the motion for new trial was properly overruled. We see that many of these cases relied upon for a reversal were cases in which the trial judge refused to permit any court reporter to be present. Judge Ron Walker never refused any party the right to have a record made. The dissent concedes that a harsh result would take place if a reversal was ordered; and that a reversal herein would be because of a non-compliance with a "technical" rule.

Karen L. Beggs, a stenographic court reporter, did certify that the pages of typewritten material prepared by her contained a true and correct copy of the proceedings conducted on December 6, 7 and 8, 1988, and that all of "the above and foregoing pages" were transcribed from her verbatim shorthand notes by her and "constitutes a complete record of all the proceedings" that she (Karen L. Beggs) personally wrote in machine shorthand during the trial of this case. We must pose this query: Why did Defendant/Appellant fail to have an independent, certified, official court reporter review and transcribe Beggs' verbatim shorthand notes in an effort to reveal mistakes, if any? Second query: Why did the Defendant/Appellant fail to have an independent, certified, official court reporter carefully listen to, audit and transcribe Beggs' audio tapes? We overrule Defendant's/Appellant's Point of Error No. 1.

■ Appellee presents and argues, with authorities, one cross point. The cross point contends that the District Court erred in providing for a $41,000.00 credit. Basically, Appellee argues that the District Court improperly calculated the amount of the credit and that no credit at all should have been granted to Appellant. We conclude that *Hunt v. Ellisor & Tanner, Inc.*, 739 S.W.2d 933 (Tex.App.—Dallas 1987, writ denied) sustains Appellee's cross point. Of course, we do not have before us the contract between the architect and Hunt but, from that opinion, we conclude that the agreement between the owner and the architects in our case is very similar, if not more favorable, to the owners. In the printed agreement between the Joint Venture and ·Van Ness, Paragraph 1.5.4 was amended. The amendment provided, in substance, that the architect shall make on-site inspections of the work at appropriate intervals to become familiar with the progress of the work, to evaluate the quality of the work and to determine if the work is proceeding according to the contract documents. And if any work of the contractor is defective, deficient or not in accordance with the plans and specifications, the same shall be reported to the owner. The architect shall endeavor to guard against defects and deficiencies in the work and the architect shall promptly reject any defective or deficient work of the contractor. Notice that the mandatory and the obligatory verb "shall" is used four times and dominates the amended Paragraph 1.5.4. Hence, we think the contract and agreement at bar is more beneficial to the owners.

In *Hunt, supra*, the jury found that the architectural firm had breached its contractual obligations and provisions. The jury awarded $41,500.00. The jury determined that Ellisor & Tanner (as architects) caused five (5%) percent of the $41,500.00 damages.

Justice Whitham, in a paragraph entitled "Disposition", reversed the trial court's judgment and rendered judgment in favor of the owners against the architects in the· full sum of $41,500.00 together with interest thereon at the rate of 10% per annum. The trial court had rendered judgment against the architects for only $2,075.00, being five (5%) percent of the damage award. *Id.*

The Dallas Court of Appeals decided that it was incorrect to apply comparative causation. The Court's rationale was that the architect's obligations were non-constructive but the general contractor's obligations were constructive in nature.

In *Hunt, supra*, the architects, Ellisor and Tanner, maintained that the principles enunciated in *Duncan v. Cessna Aircraft, Inc.*, 665 S.W.2d 414 (Tex.1984), and the

contract between the parties dictated a reduction in the damage award against them. Justice Whitham wrote, in *Hunt, supra,* at page 938:

"Consequently, we first consider the applicability of *Duncan.* We conclude that *Duncan* is inapplicable to the present case. We reach this conclusion because *Duncan* involved negligence mixed with strict liability. The present case, however, presents an action for breach of contract in which Hunt–Stephens sues for damages because it did not obtain the services that Ellisor & Tanner promised to deliver. In this connection, we note that a source relied upon by the Supreme Court in formulating its opinion in *Duncan* negates *Duncan's* application to the present case. The Supreme Court cited the Uniform Comparative Fault Act sec. 1, 12 U.L.A. 38 (Supp.1986). *Duncan,* 665 S.W.2d at 428, 430. The Act, however, excludes breach of contract cases from the doctrine of comparative causation. Uniform Comparative Fault Act at sec. 1(b). The comments below that section provide as follows:

"An action for breach of warranty is held to sound sometimes in tort and sometimes in contract. There is no intent to include in the coverage of the Act actions that are fully contractual in their gravamen and in which the plaintiff is suing solely because he did not recover what he contracted to receive.

"12 U.L.A. at 40. We conclude, therefore, that when the situation is pure contract, the special issues should not include comparative causation. *See* 5 A. Corbin, *Corbin on Contracts* secs. 999–1,000 (1964). Professor Corbin states in footnote 21 of section 999:

"In the contract field, however, if the acts of others (whether wrongful or not) are contributing factors, those others are not thereby joined with the defendant as having committed the breach of the contract.

"At most, Ellisor & Tanner argues that the general contractor 'contributed' to Hunt–Stephens' damages, but was not the 'sole' cause. Professor Corbin would hold such a defendant responsible for the *total* harm suffered even though there were contributing factors to the defendant's conduct. 5 *Corbin on Contracts* at sec. 999. Thus, we conclude that Hunt–Stephens is not required to show the proportionate fault of each wrongdoer, but must show that Ellisor & Tanner's breach was a substantial factor. Hunt–Stephens obtained such a finding from the jury in the present case when, in answer to special issue number two, the jury found that Ellisor & Tanner's breach was a producing cause of Hunt–Stevens' damages. Hence, we decline to extend *Duncan* to the present case."

We are convinced that the *Hunt* decision is dispositive of Appellee's cross point. The Joint Venture fulfills the test pronounced in *Hunt* that the architect's breach was a substantial factor. Hence, no credit should have been given. The $41,000.00 credit granted by the trial court in favor of Appellant is therefore disallowed. The judgment is reformed to restore to the Appellees this $41,000.00. The judgment, as reformed, is affirmed. Appellees' Cross Point No. 1 and Appellees' relevant Reply Point No. 25 are sustained.

The demonstrative and pictorial evidence in this case is cogent and significant. Pictures, at times, can be equivalent to thousands of words. We have attached some of the photographic evidence involving the "C–Tile". This photographic evidence was admitted without objection.

Judgment reformed and, as reformed, affirmed.

JUDGMENT REFORMED AND AFFIRMED.

APPENDIX

BURGESS, Justice, dissenting.

I respectfully dissent to the disposition of point of error number one. The majority states "From our examination of the record, we perceive the same was correct and proper." What the majority does not state is that only two volumes of the statement of facts have been certified by the official court reporter while two other volumes contain no certification by *an official court reporter*. **Rule 53(f) Certification by Court Reporter,** Texas Rules of Appellate Procedure states: "The statement of facts shall be in sufficient form to be filed in the appellate court when *it is certified by the official court reporter* (emphasis added)."

The rule as stated in *Rogers v. Rogers,* 561 S.W.2d 172 (Tex.1978) is: "if an appellant exercises due diligence and through no fault of his own is unable to obtain a proper record of the evidence introduced, this may require a new trial where his right to have the case reviewed on appeal can be preserved in no other way." Furthermore, appellant is not required to seek out any agreed statement of facts to avail himself of the rule. *Weaver v. Westchester Fire Ins. Co.,* 739 S.W.2d 23 (Tex.1987); *Vickers v. Sunrise Lumber Co.,* 759 S.W.2d 747 (Tex.App.—El Paso 1988, writ denied).

For this court to sanction the filing of a statement of facts by an uncertified court reporter would potentially undermine the court reporter certification requirements in TEX.GOV'T CODE ANN. secs. 52.021–.033 (Vernon 1988 & Supp.1990), and the official court reporter appointment procedures in TEX.GOV'T CODE ANN. secs. 52.041–.048 (Vernon 1988 & Supp.1990).

I will be the first to concede that a reversal and remand is a harsh result especially since neither party nor the trial judge was at fault. However, this is generally the case in improper, incomplete or no record cases. The substitute court report-

er had apparently misrepresented her certification to whoever approved her employment as the "roving" court reporter. Still, the absence of fault and the harshness of the result does not make the court reporter certified nor does it make the record any more proper. In terms of the rules and statutes, since she was not a certified court reporter, she was no more than a bystander. *See Soto v. State,* 671 S.W.2d 43 (Tex. Crim.App.1984) where the court reversed and remanded a misdemeanor assault case when the record was prepared by a deputy county clerk rather than a certified court reporter.

It is with no pleasure that I suggest a case, which has been fully and fairly tried to a jury, be reversed because of noncompliance with a "technical" rule. However, the integrity of the system dictates that appellate records meet minimum requirements, one of which is a statement of facts certified by an official court reporter. One of the prerequisites of being an official court reporter is to be certified. Since part of the statement of facts in this case does not meet these requirements, I would reverse and remand for a new trial. Since the majority does not, I respectfully dissent.